The FIRST NATIONAL BANK OF BLOOMING PRAIRIE, Appellant,

v.

Christy J. OLSEN, et al., Respondents,

and

M. James Potts, et al., Intervenors,

Orville M. Schroeder, et al., Intervenors, Respondents,

First National Bank of Minneapolis, First National Bank of Mabel, Intervenors,

James H. Forman, First National Bank of Windom, Gary Sola, et al., Intervenors, Respondents,

John Steele, Intervenor.

No. C4–86–1309.

Court of Appeals of Minnesota.

April 7, 1987.

Christine M. Schild, O'Brien, Ehrick, Wolf, Deaner & Downing, Rochester, for The First Nat. Bank of Blooming Prairie.

Paul V. Sween, Alderson, Ondov, Leonard & Sween, Austin, for Christy J. Olsen.

Judith Rogosheske, Drake & Rogosheske, Edina, for M. James Potts, et al.

Timothy A. Murphy, Rippe, Hammell & Murphy, Caledonia, for Orville M. Schroeder, et al.

Barbara Block Paterick, Dorsey & Whitney, Rochester, for First Nat. Bank of Minneapolis.

Peter J. Gleekel, Winthrop & Weinstine, St. Paul, for First Nat. Bank of Mabel.

Thomas W. Lewis, Lewis & Price, Windom, for James H. Forman.

Gary W. Koch, Gislason, Dosland, Hunter & Malecki, New Ulm, for First Nat. Bank of Windom.

Bob A. Goldman, Tuveson, Goldman & Nelson, Albert Lea, for Gary Sola, et al.

David V. Hoversten, Hoversten, Strom, Johnson & Rysavy, Austin, for John Steele.

Heard, considered and decided by SEDGWICK, P.J., and LANSING and CRIPPEN, JJ.

## OPINION

LANSING, Judge.

The First National Bank of Blooming Prairie, a secured creditor of Christy Olsen, brought a replevin action to obtain possession of cattle on Olsen's feedlot when Olsen was unable to pay his debt. The investor-owners claim an interest superior to the bank's and prevailed in the trial court. We affirm the priority of the investor-owners' interest, although on different grounds, and we also affirm the court's division of cattle between the investor-owners.

## FACTS

Since 1950, Christy Olsen has owned and operated a feedlot for which the First National Bank of Blooming Prairie has provided financing. The feedlot has a capacity of approximately 2,800 cattle. On February 1, 1985, the bank and Olsen entered into a loan agreement which provided Olsen with a revolving line of operating credit. The loan was evidenced by a single-payment promissory note in the principal sum of $1,475,000 maturing on February 1, 1986. On February 6, 1986, the bank agreed to extend the time for payment until March 1, 1986.

As collateral for the loan, the bank took a security interest in Olsen's personal farm property, including livestock. The value of livestock equalled approximately 95 percent of the outstanding loan balance (based on

2,500 cattle). The bank perfected its security interest by filing financing statements with the Mower County Recorder and the Secretary of State.

The bank required Olsen to provide cash flow statements, projections, and monthly inventory accounts. Each time Olsen wrote a draft on the account, the purpose of the draft had to be designated and, if the draft involved cattle, the number of head of cattle had to be noted on the draft. The number of cattle sold were to be designated on each deposit of cattle proceeds. Olsen provided the bank with monthly inventory statements showing that he personally owned 2,300–2,600 cattle. The bank's loan officers annually inspected the cattle. The bank learned on February 20, 1986, that all the cattle on the Olsen feedlot were owned by third-party cattle investors.

Following a trial on the bank's replevin action, the trial court held that Minn.Stat. § 336.2–326(3) (1984) did not apply because the cattle were not delivered for sale but were on Olsen's feedlot only on bailment. The court also found that the bank knew or should have known that Olsen had custom-fed substantial numbers of cattle and the bank was estopped from claiming the benefits of Minn.Stat. § 336.2–326. The court dismissed the bank's motion for amended findings or, in the alternative, for a new trial, and the bank appeals.

James Forman and Gary and Odean Sola, investor-owners, claimed exclusive ownership of cattle located in pens 19 and 20 on Olsen's feedlot. The trial court found that Forman and the Solas had paid Olsen for the same cattle and that Forman was entitled to half and the Solas were entitled to half. The Solas cross-appeal that decision.

## ISSUES

1. Is independent authority to sell the delivered goods necessary to the application of Minn.Stat. § 336.2–326(3)?

2. Does the evidence support the trial court's finding that the bank knew or should have known that Olsen custom-fed substantial numbers of cattle?

3. Did the trial court correctly divide the cattle in pens 19 and 20 between Forman and the Solas?

## ANALYSIS

### I

■ Goods held on sale or return are subject to the claims of the holder's creditors. Minn.Stat. § 336.2–326(2) (1984). Whether Olsen held the cattle on a "sale or return" basis depends on the interpretation of Minn.Stat. § 336.2–326(3), which provides:

> Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment on resale or uses such words as "on consignment" or "on memorandum." However, this subsection is not applicable if the person making delivery
>
> a. complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or
>
> b. establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, *or*
>
> c. complies with the filing provisions of the article on secured transactions (filing provisions of Article 9).

This section was enacted for the purpose of protecting creditors of a merchant who is the apparent owner of goods located at the merchant's place of business. *See* Uniform Commercial Code § 2–326, Official Comment.

The investor-owners deny the applicability of this section, claiming their relationship with Olsen was a bailment for the purpose of fattening cattle and not for the purpose of sale. Their argument is based

primarily on *Walter E. Heller & Co. Southeast v. Riviana Foods, Inc.*, 648 F.2d 1059 (5th Cir.1981). The trial court also relied on *Riviana* in deciding that the extent of control over the goods was determinative.

*Riviana* has been criticized as an incorrect interpretation of UCC § 2–326. *See* Note, *U.C.C. Section 2–326(3): Creditor Protection in the Deemed Sale or Return Transaction*, 32 Case Western Law Review 904 (1982). In *Georgia-Pacific Corp. v. Walter E. Heller & Co. Southeast, Inc.*, 440 So.2d 666 (Fla.App. 1 Dist.1983), the court was dealing with the same question of whether goods had been delivered "for sale," when there was no express authority to sell. The opinion stated, "[t]his court does not agree with the decision reached in the *Riviana* case," *Georgia Pacific* at 669, and held the goods had been delivered for sale.

The issue of lack of express authority to sell was directly raised in the case of *In re Novak*, 7 UCC Rptr. 196 (Md.Cir.Ct.1969). In *Novak* a merchant forwarded all proposed sales contracts to the manufacturer for credit check and approval. All billings for sales to customers were from the manufacturer's office, and all payments were made directly to the manufacturer. The court, commenting on the fact that the merchant was not shown to have actual authority to make sales, stated:

> Although certain transactions may not be sales under section 2–106(1) [of the UCC] they are "deemed to be on sale or return" "with respect to claims of creditors of the person conducting the business * * *." * * * "[T]his court does not feel it is improper to give broader application to section [2–326](3) to include transactions in which goods are delivered at least in great part for *ultimate sale*. It is reasonable to assume that a general creditor has protection under the provisions *whether his debtor had authority to sell all, part or none of the goods*. Such an interpretation, consistent with the intent of the framers of the Uniform Commercial Code, would protect creditors of unstable consignees who act as delivery and collection agents. It would

comport with Uniform Commercial Code Section 2–403(2) which provides that a merchant in possession of goods of the kind in which he deals can, in the ordinary course of business, transfer ownership to a buyer.

*Id.* at 201–02 (emphasis added).

Similarly, in *Vonins, Inc. v. Raff*, 101 N.J.Super. 172, 243 A.2d 836 (1968), the court ruled that § 2–326(3) applied to plumbing goods where Vonins was involved in selling goods of a different kind and only stored plumbing supplies at Crest's place of business. The court did "not deem it to be a prerequisite to Code application that Crest have been engaged at its premises in over-the-counter retail selling of plumbing equipment." *Id.* at 841.

In both *Novak* and *Vonins*, goods were delivered to an agent or bailee who was not permitted to sell the goods. Although it was claimed that § 2–326(3) of the Code was not applicable because the goods were only stored and warehoused, both courts ruled that § 2–326(3) of the Code governed the transactions.

Courts have been reluctant to find that goods delivered to a person who "deals" in like goods under any name other than that of the person making delivery should be treated as other than a sale or return, irrespective of the form of the sale. The UCC disregards the intended character of the transaction because every consignment includes an agency or bailment relationship. *See Manufacturers Acceptance Corporation v. Penning's Sales, Inc.*, 5 Wash. App. 501, 487 P.2d 1053 (1971); *see also Commercial Transactions: UCC Section 2–326 and Creditors Rights to Consigned Goods*, 65 Columbia Law Review 547 (1965).

In this case the investor-owners delivered possession of cattle to Olsen, who was engaged in the business of selling cattle, and they failed to give public notice of any retained interest in the cattle. They knew that Olsen purchased and sold cattle in his name. The investor-owners failed to protect their own interest in the cattle. "[S]ubsection (3) resolves all reasonable

doubts as to the nature of the transaction in favor of the general creditors of the buyer." Uniform Commercial Code § 2–326, Official Comment. For purposes of Minn.Stat. § 336.2–326(3), the cattle were deemed to be on "sale or return."

## II

The designation of "sale or return" does not complete the inquiry into whether the cattle were subject to the bank's claim while they were in Olsen's possession. Minn.Stat. § 336.2–326(3) does not apply if the person making delivery complies with a sign law, complies with Article 9 filing provisions, or establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others. Minn.Stat. § 336.2–326(3)(a)–(c). Minnesota does not have a sign law, the investor-owners did not file a security instrument, and there is only minimal evidence that Olsen was known by his creditors to be engaged in selling the goods of others.

■ However, the case law interpreting § 2–326 creates a broader interpretation of the exceptions and establishes an exemption if the secured creditor had actual knowledge of the consignment. *See In Re Gross Manufacturing and Importing Co., Inc.,* 328 F.Supp. 905, 909 (D.N.J.1971); *Columbia International Corp. v. Kempler,* 46 Wis.2d 550, 559, 175 N.W.2d 465, 469 (1970). Specifically, the court in *GBS Meat Industry PTY. Limited v. Kress-Dobkin Co.,* 474 F.Supp. 1357 (W.D.Pa.1979), stated:

> The clear import of the comments to § 2–326, and the judicial precedents * * * establish that, where a secured creditor knows that the proceeds rightfully belong to a consignor, the consignor must have priority. Any other construction of § 2–326 would contravene the intent of that section and would sanction intentional conversions of goods or proceeds.

*Id.* at 1363.

The record supports the trial court's finding that the bank had actual knowledge that Olsen custom-fed larger numbers of cattle on his feedlot than he directly acknowledged. These facts include:

1. The bank encouraged Olsen to decrease the number of cattle he owned and to custom-feed cattle in 1982.

2. In 1983 the bank's loan official's comments reflect that Olsen custom-fed 1,916 head of cattle during that year. Olsen projected custom-feeding 1,500 head of cattle in 1984.

3. The bank could have ascertained the number of cattle custom-fed because the loan activity record showed deposits for custom-feeding and only simple division was necessary for the determination.

4. Olsen's year-end report to the bank showed that he custom-fed 35 percent of all cattle in 1984.

5. Variances between the number of purchases on its activity record and on monthly inventories were substantial, and review by the bank would have alerted them that Olsen's reports were not valid.

6. A creditor (First National Bank of Mabel) of one of the intervenors testified that a bank officer talked to the bank in the late summer of 1984 and told the bank that his customers (Morkens) were feeding 1,487 head of cattle at Olsen's. Olsen testified that he saw a note in his file at the bank referring to this conversation. John Morken testified that he directed his creditor to make the call and that he was told the call had been made.

7. The bank never asked to see custom-feeding contracts, never asked which cattle were custom-fed, and never asked for the names of the owners of custom-fed cattle.

■ The evidence shows that the bank closely monitored Olsen's account, and discrepancies were present in information provided by Olsen to the bank. Simple calculations by the bank would have revealed the extent of custom-feeding, and direct testimony showed the bank was told of the extent of custom-feeding operations. The bank's knowledge of the consignments precludes recovery under Minn.Stat. § 336.2–326(3).

Where UCC provisions are determinative, the application of equitable principles is unnecessary. *See* Minn.Stat. § 336.-1–103 (1984). Thus, we do not reach the issue of whether the bank is estopped to claim the benefit of Minn.Stat. § 336.2–326(3).

### III

At trial both intervenors Forman and the Solas claimed ownership of the cattle in pens 19 and 20. The trial court determined that Forman and the Solas had paid Olsen for the same cattle. The trial court's memorandum stated:

> The question as to who is entitled to such cattle is determined by the answer to the question as to when title passed to the purchasers of the cattle. And the fact that in both instances the lot of cattle was purchased by Olsen, but as agent for Sola on one hand and Forman on the other (although they were unaware of that fact) changes nothing with respect to the application of the rule on when title passed. In other words, the title passing here involved its passing from Curran, the seller from Missouri, to Sola and Forman with Olsen being a mere conduit or agent of both with respect to such transaction.

> Minn.Stat. 336.2–401 provides, in part, as follows:

> \* \* \* \* \* \*

> "(1) * * * title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

> (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods * * *"

> ·Here there was only one lot of cattle totaling 190 head; similarly, there was only one delivery. Consequently, title passed to both buyers at the same time. Each paid for the entire lot but each, under the law, is now entitled to only half the lot.

> \* \* \* \* \* \*

We believe there was sufficient evidence presented at trial to support the trial court's conclusion. The facts clearly indicate that that Forman and the Solas paid for the same cattle. Those cattle were located in pens 19 and 20. Where the identification of each party's cattle is impossible, it is left to the trial court to determine their distribution. *See Clay, Robinson & Co. v. Larson, et al.,* 125 Minn. 271, 146 N.W. 1095 (1914); *Swanson, et al. v. St. Paul Union Stockyards Co., et al.,* 156 Minn. 483, 195 N.W. 453 (1923).

### DECISION

Investor-owners' delivery of cattle to Olsen's feedlot is deemed to be for sale or return, despite Olsen's lack of express authority to sell the cattle. However, investor owners are entitled to priority interest in cattle because bank had actual knowledge that Olsen custom-fed substantial numbers of cattle.

The trial court correctly divided the cattle in pens 19 and 20 by giving half to Forman and half to the Solas.

Affirmed.