In re KEY BOOK SERVICE, INC., d/b/a M & B Fulfillment Services, Inc., Debtor.

In re KAMPMANN & CO., INC., Debtor.

Bankruptcy Nos. 5–89–00287, 5–89–00374.

United States Bankruptcy Court, D. Connecticut.

July 21, 1989.

Robert M. Dombroff, Barbara H. Katz, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for Connecticut Bank and Trust Co.

Craig I. Lifland, Zeisler & Zeisler, P.C., Bridgeport, Conn., for Kampmann & Co., Inc.

Seymour J. Silberberg, Nachamie, Hendler & Spizz, New York City, Andrew M. DiPietro, DiPietro, Kantrovitz & Brownstein, P.C., for Key Book Service, Inc.

Tracy Alan Saxe, Sachs, Berman, Rashba & Shure, P.C., New Haven, Conn., for Independent Publishers.

Thomas S. Marrion, William S. Fish, Tyler, Cooper & Alcorn, Hartford, Conn., for Committee of Unsecured Creditors of Key Book Service, Inc.

MEMORANDUM AND ORDER ON MOTION FOR ADEQUATE PROTECTION UNDER BANKRUPTCY CODE SECTIONS 105(a) and 363(e)

ALAN H.W. SHIFF, Bankruptcy Judge.

CBT moves for adequate protection in each of the above cases[1] under Code §§ 105(a)[2] and 363(e) of its asserted security interest in alleged property of both debtors.

## I

The property which is the subject of this proceeding is the unsold or returned books located at 540 Barnum Avenue, Bridgeport, Connecticut, as of March 9, 1989, owned by publishers with whom Kampmann & Company, Inc. ("Kampmann") had sales and distribution contracts (the "subject books").

The following facts are adduced from the evidence, having considered the testimony, including an assessment of the credibility of the witnesses, and the exhibits. Kampmann was at all material times in the business of selling and performing order fulfillment services for book publishers. At the time of the commencement of Kampmann's bankruptcy case, it was the exclusive sales representative and distributor for approximately 65 publishers, including Beaufort Books, which was wholly owned by Eric Kampmann, the sole owner of Kampmann. Although Kampmann's contract duties as a distributor were not precisely defined, they included services sometimes referred to in the trade as fulfillment services, such as shipping, billing, customer service, collection of accounts receivable, and processing returns. *See Exhibit A. p. 2. of CBT Exhibit 1.*

At all material times, Key Book Service, Inc. ("Key") was in the book wholesale business, that is, it bought and sold books for its own account; it conducted a book order fulfillment business, that is it was a book distributor; and it operated a small publishing company. Key had several divisions which conducted those three enterprises, including M & B Fulfillment Services, Inc., which provided warehouse facilities and book order fulfillment services at premises it leased at 540 Barnum Avenue.

Prior to February 1, 1988 Kampmann entered into a relationship with Key under which Key provided warehouse facilities and performed fulfillment services for the publishers under contract with Kampmann. In April, 1988 Key and Kampmann entered into a Marketing and Distribution Agreement dated February 1, 1988 (the "Agreement"). *CBT Exhibit 1.* CBT and Key rely upon the Agreement to support their claim that Kampmann was an exclusive sales representative of the publishers with authority, *inter alia*, to sell the books to wholesalers; that Key was a wholesaler; and that the publishers through Kampmann sold the subject books to Key. I find, however, that the Agreement, although somewhat inconsistent, together with the testimony of Eric Kampmann, which I find to be persuasive, supports the conclusion that Kampmann contracted with Key not as a wholesaler but as a distributor. CBT and Key also argue that Key was a consignee of the subject books, but I find that Key was merely a contractor entrusted with the books to perform certain fulfillment services. *See infra* at 43. It is noted that Harold Levine, president of Key, admitted that although Key was in the wholesale business, the services Key agreed to perform under the Services Protocol section of the Agreement, *see Exhibit C. of CBT Exhibit 1*, were fulfillment services and that Key was not operating as a wholesaler in the performance of the duties outlined in the Agreement.

There is considerable disagreement as to the precise termination date of the Agreement. Harold Levine testified that despite the termination letter sent by Kampmann on December 31, 1988, business under the Agreement continued as usual until March 9, 1989. Eric Kampmann, on the other hand, testified that the Agreement terminated for cause which was not cured, effective December 31, 1988, and that the period subsequent to that date was used to wind up Key's involvement. During that so-

---

1. These cases were consolidated for the purposes of this proceeding.
2. Code § 105(a) is intended to permit the court to enter orders that are "necessary or appropriate to carry out the provisions of ... title [11]," not rewrite the Code and create new rights. Reliance upon § 105(a) is misplaced, and this decision will not consider that section as a basis for the relief sought by CBT.

called wind up period, Kampmann hired people to manage the inventory and, as Harold Levine admitted, the economic arrangements under the Agreement were changed. I am persuaded by Eric Kampmann's testimony and find that the Agreement was terminated effective December 31, 1988.

On March 9, 1989, Key filed a petition under chapter 11 and, through M & B Fulfillment Services, terminated the employment of several people and ceased the performance of the fulfillment services at 540 Barnum Avenue. Kampmann thereupon occupied the premises and hired the same people to perform the fulfillment services. Kampmann has paid at least part of the rent at Barnum Avenue.

On March 21, an involuntary chapter 7 petition was filed against Kampmann in the Southern District of New York, on March 31, Kampmann filed a petition under chapter 11 in this court, and on May 8, the two Kampmann cases were consolidated in this court.

On May 31, 1989, a restraining order entered on a joint motion filed by CBT and Key which, with the exception of 100 copies of each title which could be used for promotion purposes, enjoined Kampmann from transferring any of the books until an order entered on these instant motions. On that same date, Kampmann's motion for approval of the rejection of each executory contract it had with the publishers was approved by the order of this court. Subsequently, Kampmann entered into a contract with National Book Network ("NBN") under which Kampmann is to serve as NBN's exclusive sale representative for those publishers who contract with NBN for sales and distribution services.

## II

Code § 363(b)(1) provides that the trustee or, as in these cases, the debtors in possession, 11 U.S.C. § 1107, "after notice and a hearing, may use; sell, or lease, other than in the ordinary course of business, property of the estate ...," and subsection (c)(1) states that the trustee/debtor in possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, and may use property of the estate in the ordinary course of business, without notice or a hearing...." Code § 363(e) provides:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

Thus, to be entitled to adequate protection under § 363(e) from either or both of the debtors, CBT must show that: (1) the subject books are property of that debtor's estate, (2) the debtor intends to use the subject books,[3] and (3) CBT has an interest in the subject books. If CBT satisfies that burden of proof, the trustee/debtor in possession of such estate has the burden of proving that CBT is adequately protected. For the reasons that follow, I conclude that with the exception of the Beaufort books, the subject books are not the property of either estate, but even if they are, neither debtor is using or proposes to use those books. Moreover, CBT does not have a security interest in any of the subject books.

### A.

### Property of Either Estate

■ The following analysis does not include the Beaufort books. Code § 541(a) broadly defines property of a bankruptcy estate. Under subsection (a)(1) such property includes "all legal or equitable interests of the debtor as of the commencement of the case." Kampmann argues that its

---

**3.** No claim is made that either debtor is or proposes to sell or lease the subject books. *See* 11 U.S.C. § 363(b)(1), (c)(2).

Kampmann's motion to reject its executory contracts also sought an order approving its proposed contract to act as NBN's exclusive sales representative. On May 31, 1989, I ruled that an order was not necessary in that the proposed contract was within the ordinary course of Kampmann's business. Key has not filed a motion under § 363(b)(1).

only property rights or interests with respect to the books were derived from its sales and distribution contracts with the various publishers it represented, and that those rights and interests terminated upon the entry of this court's order on May 31, 1989 permitting it to reject all of those contracts under § 365(a). CBT argues that Kampmann's rejection under § 365(a) was a transparent attempt to avoid a duty to provide adequate protection to CBT under § 363(e). According to CBT, Kampmann always intended to perform sales services for those publishers, and a transfer of the books to NBN in Maryland is in fact a use of the books, which were property of the Kampmann estate subject to CBT's asserted security interest. The flaw in CBT's position is that Kampmann only has a right to sell a publisher's books if that publisher enters into a sales and distribution contract with NBN, Kampmann has no control over whether any given publisher enters into such a contract, and if a publisher declines to contract with NBN, Kampmann cannot perform any services for that publisher. As of this date, although several of Kampmann's former customers are negotiating with NBN and other distributors, only a few have agreed to a contract with NBN. I accordingly conclude that with the single exception of the Beaufort Books, which represent 150,000 to 200,000 of the books under consideration here, Kampmann is in possession of all of the other books on an involuntary basis due to this court's injunction, that Kampmann is not using those books, and that its rejection of the contracts terminated all of its property rights and interests in that property.

As noted, *infra* at 40, Key's duties under its Agreement with Kampmann more likely fit within the parameters of a contractor entrusted with the books for the purpose of providing specified distribution services. As such, Key would have no property rights or interests in the subject books. If, however, the Agreement could be read to define Key's role as that of a consignee, apart from the question raised by the publishers represented by attorney Saxe of whether Kampmann could assign or delegate those duties to Key, CBT cannot prevail for the simple reason that Key has vacated the premises at Barnum Avenue, it has terminated its Agreement with Kampmann, and it is not nor does it propose to use any of the subject books.[4]

For the foregoing reasons, CBT is not entitled to adequate protection from either estate, but apart from that analysis, it is clear that CBT does not have a security interest in any of the subject books under Connecticut's version of the Uniform Commercial Code, Connecticut General Statutes § 42a-2-326.

### B.

### Uniform Commercial Code § 2-326

■ The following analysis includes all of the subject books, including the Beaufort books. CBT claims that its security interest[5] attached to the subject books pursuant to Connecticut General Statutes § 42a-2-326, which provides in part:

(2) Except as provided in subsection (3), ... goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return.... However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

---

4. CBT's claim that Key still owns the shelving on which the subject books are stored as well as some of the machinery used to move them hardly gives Key a property interest in the books or demonstrates that Key is using that property, even assuming that the shelves are not fixtures which belong to the landlord.

5. CBT executed a security agreement with Key on February 25, 1988, which covered all inventory owned by Key and all after acquired inventory, *CBT Exhibit 3,* which was duly perfected by a financing statement filed on March 2, 1988. *CBT Exhibit 4.*

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9).

In support of its claim, CBT contends that the requirements of subsection (3) were satisfied and that none of the exceptions to that subsection apply. I disagree.

It is apparent from the testimony of Eric Kampmann, admissions of Harold Levine and CBT Exhibit 1 that Kampmann was to sell the books, set the prices and the credit terms, and direct delivery. Accordingly, I find that the subject books were not delivered to Key "for sale", *see infra* at 40, but rather that Key was entrusted with the books for the limited purpose of performing mechanical functions such as shipping and billing and providing warehousing facilities until they were sold *by Kampmann. See Medomak Canning Co. v. William Underwood Co. (In re Medomak Canning Co.)*, 25 U.C.C.Rep.Serv. 437, 448 (D.Maine 1977).

Even if Key was a consignee, I find that CBT is not the type of creditor which § 42a–2–326 is intended to protect. Connecticut General Statutes § 42a–1–102(1) provides that "[t]his Act [the Uniform Commercial Code] shall be liberally construed and applied to promote its underlying purposes and policies." *Universal Lightning Rod, Inc. v. Rischall Electric Co., Inc.*, 24 Conn.Supp. 399, 192 A.2d 50, 1 U.C.C.Rep. Serv. 269, 270 (Cir.Ct.1963). Comment 1 of that section states that

[t]he Act should be construed in accordance with its underlying purposes and policies. The text of each section should be read in the light of the purpose and policy of the rule or principle in question, as also of the Act as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved.

The purpose of § 42a–2–326(3) is to prevent creditors from being misled by a hidden lien. *Walter E. Heller & Co. Southeast v. Riviana Foods, Inc.*, 648 F.2d 1059, 1062 (5th Cir.1981); *Cantor v. Anderson*, 639 F.Supp. 364, 369 (S.D.N.Y.1986); *GBS Meat Indus. Pty. Ltd. v. Kress–Dabkin Co., Inc.*, 474 F.Supp. 1357, 27 U.C.C.Rep. Serv. 388, 393 (W.D.Pa.1979); *Matter of Gross Mfg. & Importing Co., Inc.*, 328 F.Supp. 905, 909 (D.N.J.1971). The exceptions found in subsection (3) are intended to limit that subsection to instances where creditors of a consignee may have been misled by a secret lien. *Walter E. Heller & Co., supra*, 648 F.2d at 1062; Conn.Gen. Stat. § 42a–2–326, comment 2. Thus, where a secured creditor knows that goods rightfully belong to a consignor, § 42a–2–326(3) is not intended to provide that creditor with protection, and the consigned goods are not subject to that creditor's lien under that provision. *Walter E. Heller & Co., supra*, 648 F.2d at 1062; *Cantor, supra*, 639 F.Supp. at 368–69; *GBS Meat Indus., supra*, 474 F.Supp. 1357, 27 U.C.C.Rep.Serv. at 393–94; *Newhall v. Haines*, 10 B.R. 1019, 1023 n. 5 (D.Mont.1981); *First Nat'l Bank of Blooming Prairie v. Olsen*, 403 N.W.2d 661, 3 U.C.C.Rep.Serv.2d 554, 559–60 (Minn.Ct.App.1987). *But see Multibank Nat'l of W.Mass., N.A. v. State Street Auto Sales, Inc.*, 81 B.R. 215, 218–20 (Bankr.D.Mass.1988).

It is obvious from the evidence that CBT had full knowledge that the subject books were the property of the publishers. In fact, a copy of the Agreement which included a representative copy of Kampmann's contract with the publishers it represented, *see Exhibit A of CBT Exhibit 1*, was given to CBT when it was negotiating the loan and security agreement with Key. I therefore conclude that because CBT had knowledge of the publishers' ownership interest in the subject books, § 42a–2–326 is inapplicable, and CBT's lien did not attach.

### III

For the foregoing reasons, CBT's motions are denied, and IT IS SO ORDERED.