In re Franklin Doty MILLER.

FIRST STATE BANK OF PURDY, MO.,
et al., Appellants,

v.

Franklin Doty MILLER, et
al., Appellees.

Civ. No. 90–5026.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Sept. 13, 1990.

James Clark, Jr., Little Rock, Ark.,
Charles L. Gocio, Bentonville, Ark., William
R. Gibson, William Greenhaw, Fayetteville,
Ark., Ronald Boyer, Rogers, Ark., Charles
Hanks, Fayetteville, Ark., for appellants.

Field K. Wasson, Jr., Little Rock, Ark.,
Craig A. Campbell, Rogers, Ark., Jill R.
Jacoway, Fayetteville, Ark., W. Michael
Reif, Little Rock, Ark., Wm. Jackson Butt,
Davis Cox & Wright, Fayetteville, Ark., for
appellees.

Kirby & Bonnie Brooks, Washburn, pro
se.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief
Judge.

This is an appeal from a decision of the
United States Bankruptcy Court for the
Western District of Arkansas in an action
arising out of the bankruptcy of Franklin

Doty Miller. The First State Bank of Purdy, Missouri, the First National Bank and Trust Company of Rogers, Arkansas, and the Creditors' Committee appeal from the bankruptcy court's decision that the seed held in storage by the debtor was not subject to the security interests of the two banks. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

### FACTS

The basic facts are not in dispute and will be quickly summarized. On March 1, 1989, Franklin Doty Miller (debtor) filed a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code. Mr. Miller owned and operated Miller Seed Company in Pea Ridge, Arkansas. The business primarily engaged in the buying, processing, and selling of fescue seed on a wholesale distribution basis. Additionally, the Seed Company would clean, bag, and store seed for farmers and other business entities. The seed brought to the debtor's facility for cleaning, bagging, and storage was commingled with other seed of like quality.

The debtor's principal cleaning and storage facility was at Pea Ridge. The debtor had "buying stations" in Carthage, Longview, Exeter, and Neosho, Missouri. These stations allowed the farmers to deliver the seed to the debtor in Missouri. Thereafter, the debtor transported the seed to Arkansas for processing.

On June 24, 1985, the debtor obtained a loan in the amount of $850,000.00 from First National Bank and Trust Company (hereinafter First National). The debtor granted First National a security interest, *inter alia*, in "all inventory whether now owned or hereafter acquired and wherever located." A financing statement was filed in 1985 in Benton County, Arkansas. On July 1, 1986, the debtor refinanced his line of credit by executing two promissory notes in the total amount of $1,100,000. It is undisputed that the 1985 filing perfects First National's security interest in the debtor's inventory.

On June 20, 1988, the debtor executed a security agreement in favor of the First State Bank of Purdy, Missouri, (hereinafter First State) granting a security interest in "800,000 pounds of clean fescue seed" to secure a principal indebtedness of $378,-926.81. First State recorded financing statements in Newton and McDonald Counties, Missouri, but not in Benton County, Arkansas. At the time the security agreement was signed the seed was stored in Neosho, Missouri. A bank officer testified that First State was not advised the seed would be moved to Arkansas.

In his bankruptcy petition the debtor included a statement to the effect that debtor held seed belonging to various farmers. At the time the loans discussed *supra* were made, the lending officers were not aware that the debtor occasionally stored seed for farmers. On March 17, 1989, Tony Havelka, one of the farmers, filed a motion to abandon a certain quantity of fescue seed alleged to be held by the debtor in storage pursuant to a bailment contract. As of June 13, 1988, Havelka contended he had 489,217 pounds of seed on "free storage" with Miller Seed Company. The testimony showed that farmers were charged a fee for cleaning and bagging but storage was "free."

Over a period of time, Havelka delivered a substantial amount of seed to the debtor. Subsequently, Havelka drafted a statement dated June 13, 1988, stating: "This statement verifies that Tony Havelka has 489,-217 # of 98/85 bagged fescue seed on free storage at Miller Seed Company. Cleaning and bagging charges are due when seed is sold and final settlement is made." The statement also set forth the cleaning and bagging charges.

In early 1989, after Havelka became aware of the debtor's financial difficulties, Havelka's attorney drew up a bailment agreement to "flesh out" the deal. The bailment agreement was dated February 22, 1989, and provided in part:

> 1. Bailee agrees to clean, bag, and store the above-described fescue seed for a one time charge of $8.50 per cwt. which shall be due when seed is sold or removed from storage.

2. Bailee warrants that it has not pledged, assigned, encumbered or granted any security interest in, or allowed any liens, charges, encumbrances, or legal processes to be imposed or levied on, any of the fescue seed described in this bailment agreement. Further, bailee agrees that it shall not pledge, assign, encumber, or grant any security interest in, or allow any liens, charges, encumbrances, or legal processes to be imposed or levied on, any of the fescue seed described herein.

\* \* \* \* \* \*

6. Bailor and bailee acknowledge recent negotiations concerning the sale of Bailor's fescue seed to an unnamed third party through Ben Baldwin, a seed broker in Springfield, Missouri. This Agreement is signed in part to document those negotiations. Bailor acknowledges and agrees that Bailee may sell bailor's seed through Ben Baldwin as long as bailor receives, directly from Ben Baldwin or the third-party purchaser (by cashier's check or approved draft drawn on Ben Baldwin or the third-party purchaser), $283,745.86 plus bailor's attorney's fees incurred in this matter. Bailee and bailor acknowledge that the figure of $283,-745.86 represents a net to bailor of $.58 per pound on the 489,217 lbs. of fescue seed stored with bailee. In the event bailee sells bailor's seed as contemplated herein, bailee will not charge bailor any fees for storing, bagging, or cleaning the seed. Bailor and bailee agree that any variance in the sale of bailor's seed from the terms of this paragraph 6 must be preapproved by bailor in writing pursuant to paragraph 5 herein.

A few days thereafter, on March 1, 1989, the debtor filed his bankruptcy petition. On March 17, 1989, Havelka filed his motion to abandon. The debtor responded by conceding that the seed was not property of the estate. First National, First State, and the Creditors' Committee filed responses contending the seed was property of the estate and subject to the banks' valid security interests. Other responses were filed by farmers claiming ownership of various quantities of seed alleged to be held in storage by the debtor.

The claims of other farmers to seed being held in storage by the debtor differ from Havelka's claim only in that the transactions are merely evidenced by weight tickets. Some of the weight tickets had the notation "store" written in the margin. All the farmers who testified were aware that their seed would be commingled. The testimony was that this occurred in the ordinary course of business and that only in unusual situations was specific seed segregated. The farmers did not expect the debtor to retain in storage the specific seed they deposited. The debtor maintained records of the amount of seed in storage. The debtor testified he had the right to sell the seed he held as long as he retained enough seed to satisfy everyone's demand or had enough money to pay the people off.

The debtor was not given explicit authority to sell the farmers' seed with the exception of paragraph six of the agreement with Havelka; nor did any of the farmers have an agreement to sell their seed to the debtor. Thus, the debtor was under no obligation to purchase the stored fescue seed. Eventually 90% to 98% of the farmers would sell their seed. Only very rarely was any seed removed from storage by the farmers. Thus, generally the seed was held in storage for future sale.

First National and the Creditors' Committee argue that the farmers' seed is subject to the First National's security interest as after acquired inventory of the debtor. First State advances this same argument on its behalf. These arguments are premised on the theory that the seed was deemed to be held for "sale or return" and thus subject to the claims of creditors under the Uniform Commercial Code. First National additionally argued that First State's security interest is unperfected because First State failed to file a financing statement in Benton County, Arkansas. The farmers collectively argue that they are the owners of the seed and that no security interest exists therein because the debtor was a mere bailee and had no rights

in the collateral sufficient to support a security interest in favor of a third party.

By order entered August 28, 1989, the bankruptcy court held that the relationship of bailor-bailee exists between the debtor and the farmers, that the stored seed was owned by the farmers, and that the debtor did not have title to the fescue seed. On January 30, 1990, after notices of appeal had been filed, a supplemental order was entered concluding that "the fescue seed delivered to the debtor by the farmers is not property of the estate and is not subject to any security interest in favor of First State Bank of Purdy, Missouri, or First National Bank and Trust Company of Rogers, Arkansas." The court noted Ark. Code Ann. § 4–9–203(1) requires that a debtor have rights in collateral before a security interest can attach. The order further recited an agreement between the parties on the distribution of the seed and/or the proceeds from the sale of the seed. The parties reached an agreement providing for the distribution of the seed and/or proceeds in the event the bankruptcy court ruled in favor of the farmers.

In addressing the parties' arguments the court noted:

> Both banks and the creditors' committee argue that the substance of the transactions was a sale on approval or sale on return by the farmers to the debtor. Therefore, when the debtor acquired possession of the seed he had sufficient rights in the seed for the banks' security interest to attach. However, the evidence in this case does not support the contention that sales occurred. Here, the evidence is that the debtor had possession of the seed pursuant to bailment contract with the true owners. The debtor was only authorized to clean, bag, and store the seed for the farmers. The debtor had no authorization, express or implied, to encumber the farmers' seed. Significantly, the debtor and the farmers all testified that the transactions were not sales but bailment contracts.

From these orders both banks and the Creditors' Committee appeal.

## DISCUSSION

■ This court is bound by the clearly erroneous standard of review for factual determinations made by the bankruptcy judge. Bankr.R. 8013. *See also In re Hunter*, 771 F.2d 1126, 1129 n. 3 (8th Cir. 1985). This court is obligated to give "due regard ... to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankr.R. 8013. *See also Matter of Van Horne*, 823 F.2d 1285 (8th Cir. 1987). The *de novo* standard of review is applicable to legal determinations. Bankr.R. 8013.

This case turns on the interpretation and application of Ark.Code Ann. § 4–2–326(3).[1] Section 2–326 provides in pertinent part:

> 4–2–326. Sale on approval and sale or return—Consignment **sales and rights of creditors.**
>
> (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:
>
> (a) A "sale on approval" if the goods are delivered primarily for use; and
>
> (b) A "sale or return" if the goods are delivered primarily for resale.
>
> \* \* \* \* \* \*
>
> (3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery:

---

1. Hereafter the sections of the Uniform Commercial Code as adopted by Arkansas, will be designated as UCC followed by the section number.

(a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

(b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

(c) Complies with the filing provisions of the chapter on secured transactions (chapter 9 of this title).

Ark.Code Ann. § 4-2-326.

This section abolishes the traditional distinction drawn between contracts of sale or return and sales on consignment or memorandum. The distinction generally drawn was primarily dependent on the passage of title. A "sale or return" vested title in the purchaser with an "option in the purchaser to return the goods and thus revest title in the seller...." *In re Ide Jewelry Co.*, 75 B.R. 969, 973 (Bankr.S.D.N.Y.1987), *quoting, Ginsberg v. Martin*, 122 Misc. 468, 468-69, 203 N.Y.S. 110, 111 (1st Dep't 1924). Whereas in a consignment sale the purchaser had the option to take title upon certain conditions. In the interim title remained in the seller. *In re Ide*, 75 B.R. at 973. Thus, the relationship between the parties was one of principal and agent. The issue of title was important in determining who bore the risk of loss and whether the goods were subject to the claims of the dealer's creditors.

Under the UCC two types of consignments are treated as sale or return transactions. First, under § 2-326(1)(a) the transaction is actually a sale or return if goods are delivered *primarily* for resale. Second, under § 2-326(3) a transaction may be *deemed* a sale or return even though the transaction is "not a sale with title passing to the buyer." *Manger v. Davis*, 619 P.2d 687, 692, 30 U.C.C.Rep.Serv. (Callagan) 515, 633 (Utah 1980). Section 2-326(3) is applicable even though the agreement purports to reserve title. In both instances the goods will be subject to the claims of the "buyer's" creditors. UCC §§ 2-326(2), 2-326(3).

■ Thus, under § 2-326(3) goods are deemed to be on a sale or return basis if (1) the goods are delivered to a person for sale and (2) such person maintains a place of business at which he deals in goods of the kind involved and (3) he deals under a name other than the name of the person making delivery. A consignor or bailor may protect himself from having his delivery of goods deemed a sale or return by: (1) complying with an applicable sign law; (2) establishing that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or (3) complying with the filing provisions of Article 9. UCC 2-326(3)(a-c).

"The purpose of ... 2-326(3) is to prevent creditors from being misled by a hidden lien." *In re Key Book Service, Inc.*, 103 B.R. 39, 43 (Bankr.D.Conn.1989). *See also In re Monahan & Co.*, 29 B.R. 579, 583 (Bankr.D.Mass.1983). The rationale behind this strict attitude was well stated in Shanker, *Bankruptcy, and Article 2 of the Uniform Commercial Code*, 40 J.Nat'l. Conf.Reg.Bankr., No. 2, quoted in *In re Monahan & Co., Ltd.*, 29 B.R. 579, 583 (Bankr.D.Mass.1983) and *In re Gross Manufacturing and Importing Co.*, 328 F.Supp. 905, 909 (D.N.J.1971):

The basis for this hostility to consignment arrangements from the bankruptcy courts is fairly obvious. Regardless of the legal theory of the consignment, in practical operation it looks like a sales transaction in which the unpaid seller retains a secret lien in his goods. From a creditor's point of view, the consigned goods appear to be part of the regular inventory of the consignee which, therefore, ought to be subject to their claims. What is more, unlike a pre-code chattel mortgage, there is no public filing or other notoriety respecting the consignment to warn the creditors that the consignor may have rights in the goods which are superior to theirs.

The code drafters were apparently much impressed that the consignment situation could be terribly misleading to creditors of the consignee. So, while the Code permits the consignment transaction to continue, it declares that the consignment will be valid as against credi-

tors only if there is some way by which creditors can learn of the consignment.

 Where the secured creditor knows that the goods belong to a consignor the goods are not subject to that creditor's lien. *In re Key Book Service, Inc.*, 103 B.R. 39, 43 (Bankr.D.Conn.1989) (§ 2–326 inapplicable where creditor had full knowledge); *Newhall v. Haines*, 10 B.R. 1019, 1023 n. 5 (D.Mont.1981); *First National Bank of Blooming Prairie v. Olsen*, 403 N.W.2d 661, 3 U.C.C.Rep.Serv.2d 554, 559–60 (Minn.App.1987). *But See* J. White and B. Summers, *Handbook of the Law under the Uniform Commercial Code*, § 22–4 (2d Ed.1980). The official comment to this section states:

> Pursuant to the general policies of this Act which require good faith not only between the parties to the sales contract, but as against interested third parties, subsection (3)(A.C.A. § 4–2–326(3)) resolves all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer. As against such creditors words such as "on consignment" or "on memorandum," with or without words of reservation of title in the seller, are disregarded when the buyer has a place of business at which he deals in goods of the kind involved.

Clearly in this case the debtor dealt in fescue seed and was selling seed under a name different from that used by any of the farmers. Additionally, there is no argument that the farmers complied with the public notice provisions. The issue disputed is whether the feed was delivered to the debtor "for sale." If the goods were delivered "for sale" then the seed would be subject to the claims of the creditors of Miller Seed Company. Indeed, Section 2–326(3) specifically states the goods are subject to the creditors' liens. The fact that the parties may have intended only a bailment contract is irrelevant. The adoption of the UCC changes the common law of bailment and requires that a traditional bailment contract be deemed a sale or return transaction unless the bailor has complied with the notice provisions set forth in

§ 2–326(3)(a–c). *In re Monahan & Co., Ltd.*, 29 B.R. 579, 581 (Bankr.D.Mass.1983).

Appellants argue that the bankruptcy court's analysis was flawed because it focused on whether there had been a sale rather than on the issue of whether the items were being held for sale. Appellants point out that in *Simmons First National Bank v. Wells*, 279 Ark. 204, 650 S.W.2d 236 (1983), the court stated that "[w]ith regard to the rights of creditors, it is irrelevant whether the transaction between the two parties was a bailment or a sale if the provisions of 85–2–326(3) [now codified as Ark.Code Ann. § 4–2–326(3)] are also satisfied." *Id.* at 209, 650 S.W.2d 236.

The *Simmons* case involved a claim made by Wells, a rice grower, who had an oral agreement with Western Rice Mills, Inc., to the effect "that Western would mill the rice for a certain price and then market the rice at an agreed price for Wells. The charge for milling would be deducted when Western sold the rice, and the remaining proceeds would go to Wells. In the interim, the rice was stored with Western." *Id.* at 206–07, 650 S.W.2d 236. In the past Western had purchased the rice outright from Wells, but because of financial difficulties the alternate arrangement quoted, *supra*, was made. *Id.* at 206, 650 S.W.2d 236.

The trial court found the arrangement to be a bailment and found Ark.Stat.Ann. § 85–2–326 inapplicable. The Supreme Court reversed noting that Western could have been a bailee for Wells and at the same time a consignee under § 2–326. *Id.* at 208, 650 S.W.2d 236. The *Simmons* court quoted extensively from *In re KLP, Inc. Finance Co of America v. Morris*, 7 B.R. 256 (Bankr.N.D.Ga.1980). Relying on *In re KLP* and other cases cited, the court rejected the argument that § 2–326 was not applicable unless there had been an actual sale between consignor and consignee. *Id.* 279 Ark. at 211, 650 S.W.2d 236.

*In re Medomak Canning Co.*, 25 U.C.C. Rep.Serv. 437 (D.Maine 1977) reached a different conclusion. There the court held the transaction did not constitute a "sale or

return" when no sale was contemplated as between A and B. A and B had an arrangement by which A furnished ingredients, packaging and shipping materials for canned pork and beans to B and agreed to pay B a certain amount per case for the finished product. The *Medomak* court, in concluding § 2–326 was inapplicable, relied on the UCC comment to the affect that "This section presupposes that a contract for sale is contemplated by the parties although that contract may be of the peculiar character here described." However, this comment appears to be directed at an actual sale or return as defined in 2–326(1) rather than a transaction deemed to be a sale or return under 2–326(3). *See also In re Key Book Service, Inc.*, 103 B.R. 39, 43 (Bankr.D.Conn.1989) (§ 2–326 inapplicable because contemplated sale was to be by bailor); *Employers Casualty Co. v. Peterson*, 609 S.W.2d 579 (Tex.Civ.App.1980) (Relies on the same comment and holds that items delivered to be sold at the agreed prices stated above were not on sale or return because no contract for sale contemplated by the parties).

The majority of the courts have agreed with the *Simmons* court and have broadly construed § 2–326(3). *In re Monahan & Co., Ltd*, 29 B.R. 579 (1983) involved the delivery of two rings to a retail jewelry business pursuant to the following agreement:

> The goods described and valued as below are delivered to you for EXAMINATION AND INSPECTION ONLY and remain our property subject to our order and shall be returned to us on demand. Such merchandise, until returned to us and actually received, are at your risk from all hazards. NO RIGHT OR POWER IS GIVEN TO YOU TO SELL, PLEDGE, HYPOTHECATE OR OTHERWISE DISPOSE of this merchandise regardless of prior transactions. A sale of this merchandise can only be effected and title will pass only if, as and when we the said owner shall agree to such sale and a bill of sale rendered therefor.

*Id.* at 581. Written by hand on the agreement were the words "To work with customer." *Id.* The court found the goods

were delivered for sale although the right to sell was subject to certain terms. *Id.* at 582. *See also In re Ide Jewelry Co., Inc.*, 75 B.R. 969 (Bankr.S.D.N.Y.1987).

Furthermore, courts have stated that the "[l]ack of express authority to conclude a sale does not bar a finding that the transaction between the dealer and his supplier was a sale or return...." *Escrow Connection v. Haas*, 189 Cal.App.3d 1640, 235 Cal.Rptr. 200 (1987) (Car delivered to defendants to enable defendants to "look for buyers." California has enacted a special subsection providing an exemption relieving noncommercial transactions, which involve used goods, from the burden of compliance with section 2–326). These cases:

> give broader application to section [2–326](3) to include transactions in which goods are delivered at least in great part for ultimate sale. It is reasonable to assume that a general creditor has protection under the provisions whether his debtor had authority to sell all, part or none of the goods. Such an interpretation, consistent with the intent of the framers of the Uniform Commercial Code, would protect creditors of unstable consignees who act as delivery and collection agents. It would comport with Uniform Commercial Code Section 2–403(2) which provides that a merchant in possession of goods of the kind in which he deals can, in the ordinary course of business, transfer ownership to a buyer.

*In re Novak*, 7 U.C.C.Rptr. 196, 201–02 (Md.Cir.Ct.1969). *See also First National Bank of Blooming Prairie v. Olsen*, 403 N.W.2d 661, 3 U.C.C.Rep.Serv.2d 554 (1987) (cattle delivered to feedlot for purpose of fattening cattle and not for sale); *Vonins, Inc. v. Raff*, 101 N.J.Super. 172, 243 A.2d 836 (1968).

Another court in summarizing the relevant case law noted:

> Courts have been reluctant to find that goods delivered to a person who 'deals' in like goods under any name other than that of the person making delivery should be treated as other than a sale or return, irrespective of the form of the sale. The UCC disregards the intended

character of the transaction because every consignment includes an agency or bailment relationship.

*First National Bank of Blooming Prairie v. Olsen,* 403 N.W.2d at 664, citing, *Manufacturers Acceptance Corporation v. Penning's Sales, Inc.,* 5 Wash.App. 501, 487 P.2d 1053 (1971); *Commercial Transactions:* UCC Section 2–326 and *Creditors Rights to consigned Goods,* 65 Columbia Law Review 547 (1965).

In this case the farmers delivered the fescue seed to the debtor, who did business as a seed company, and they failed to take any of the statutorily prescribed protective steps. Thus, members of the public had no notice that the farmers retained interest in the fescue seed. The farmers knew the type of business the debtor was in and several, if not all, had in the past sold fescue seed to the debtor. Although the debtor was not given the explicit authority to sell the goods, this does not, under the relevant case law, make § 2–326(3) inapplicable. In fact, the official comment to this section indicates subsection (3) was meant to resolve "all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." Indeed the testimony indicated that it was contemplated that the seed would be sold when the market price reached an acceptable level. The storage arrangement merely served as an interim measure.

The facts are undisputed. The dispute centers on the interpretation given to the language of 2–326. We hold that the seed was being held for ultimate sale and that 2–326(3) is applicable. Accordingly, the transactions in issue are deemed to be "sale or return" transactions and are subject to the claims of the debtor's creditors.

A separate order in accordance herewith will be concurrently entered.