**In the Matter of GEC INDUSTRIES, INC., f/k/a Gates Engineering Co., Inc., Debtor.**

**GEC INDUSTRIES, INC., f/k/a Gates Engineering Co., Inc., Plaintiff,**

v.

**COLONIAL RUBBER WORKS, INC., Defendant.**

**Bankruptcy No. 89–44.**
**Adv. No. 89–46.**

United States Bankruptcy Court,
D. Delaware.

June 27, 1991.

894

James L. Patton, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, Del., Douglas J. Smillie, Pauline K. Morgan, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for debtor/plaintiff.

Francis J. Murphy, Ashby, McKelvie & Geddes, Wilmington, Del., for defendant.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

GEC Industries, Inc., formerly known as Gates Engineering Co. (Gates), brought a turnover/preference action against Colonial Rubber Works, Inc. (Colonial). Gates seeks to recover the value of certain roofing materials purchased from Colonial and which were stored at Colonial's warehouse facilities. Gates contends that Colonial wrongfully converted bailed goods or, in the alternative, the transfer even if authorized by Gates was a voidable preference under 11 U.S.C. § 547(b). Colonial counters that it obtained a statutory lien over the materials by virtue of U.C.C. § 2–703 and thereby is exempt from the preferential transfer prohibitions of the Bankruptcy Code; alternatively, Colonial asserts that its statutory lien allows a valid, prepetition setoff under 11 U.S.C. § 553. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(E), (F), (K), and (O).

### Background

Gates and Colonial have had an ongoing business relationship since 1985 whereby Colonial sold Gates EPDM—a black rubber roof sheeting material—and related accessories for resale on consignment. No formal written contract encompassing the terms of the relationship exists. There

was a verbal agreement that payment was due in 30 days. Typically, Gates, which has its principal offices in Wilmington, Delaware, would place orders with Colonial by written purchase order or by telephone specifying the quantity, gauges, and widths of the EPDM rolls. Colonial, which has its main offices in Dyerstown, Tennessee, would confirm the order by telephone or fax. Gates would indicate whether the goods were to be shipped by common carrier directly to the customer, to Gates' own facilities, or were to be held in Colonial's warehouses pending further instructions by Gates. After each order was filled, Colonial issued invoices showing if the materials were shipped to a customer, Gates, or moved to a segregated area of Colonial's warehouses. All Gates' purchases of EPDM were made from Colonial on its credit account, though no monthly statements were sent to Gates summarizing the activity of Gates' account. Around mid-1988, the payment terms were modified to provide that payment was due within 60 days of receipt of the invoice even though Colonial usually allowed only 30 days for other customers to tender payment. The separate invoices issued for each order were used administratively by Colonial to keep track of the EPDM rolls for warranty purposes.

The facts giving rise to the present dispute—many of which were stipulated to by the parties—are as follows: Gates submitted its Purchase Order No. 25978 dated November 20, 1986 to Colonial for 100 rolls of black EPDM .045″ × 10′ × 100′. The purchase order states under the "SHIPMENT TO ARRIVE" caption that the order was "TO BE PUT IN OUR CONSIGNMENT"; in addition, various boilerplate provisions were printed on the reverse side of the purchase order. On receipt of Gates' purchase order, Colonial forwarded to Gates Invoice No. 71400 on November 21, 1986 which states the amount due as $16,500 and contains under the heading "SHIP TO:" the words "Inventory Move". On January 9, 1987, Gates remitted the amount owed in this transaction along with sums owed on 10 other shipments to Colonial's Charlotte, North Carolina office per Gates' Check No. 023140 for $119,562.50.

In another transaction, Gates submitted Purchase Order No. 12121 dated May 26, 1988 to Colonial for 136 rolls of EPDM .045″ × 10′ × 100′. Upon receipt of the purchase order, Colonial issued Invoice No. 78655 dated June 1, 1988 indicating that $23,800 was due. Subsequently, Gates paid this amount along with two other shipment balances by Check No. 034497 dated July 29, 1988 for $60,300.

In the final transaction at issue, Gates submitted Purchase Order No. 12330 to Colonial for 240 rolls of EPDM .060″ × 10′ × 100′ dated June 30, 1988. Colonial issued Invoice No. 77698 dated July 11, 1988 reflecting $42,000 due as well as Invoice No. 77723 dated July 12, 1988 indicating $25,200 due. Gates paid for these materials along with one other invoiced shipment by Check No. 035094 dated September 9, 1990. All the goods purchased in the above transactions were stored in Colonial's Dyersburg facilities except for those involved in the June 1 sale where the materials were stored in Colonial's Kingstree, South Carolina warehouse. There were numerous other transactions between Colonial and Gates not relevant here which have not been described.

Around October 26, 1988—90 days prior to Gates' bankruptcy filing—Gates owed Colonial approximately $146,177 on its account even though Colonial still held about $64,325 worth of inventory in its warehouses for Gates. Prior to the Fall of 1988, Gates had been a good customer and had made timely payments on its Colonial account; however, Gates had been put on Colonial's credit watch list and the company's credit manager, Sandra Walton, began calling weekly or so around this time to demand payment from Gates. For its part, Gates had been facing a crescendo of litigation arising from Gates' warranties issued from 1978 to 1983 and Gates' management blamed Colonial's price increases for aggravating its financial difficulties. In early December 1988, Gates sought the release of its stored inventory for shipment to Gates' facilities, but Colonial declined be-

cause of the approximate $148,588 past due on Gates' account. Colonial's financial manager, Paul Forster, checked with in-house counsel to verify whether the company could lay claim to the materials. Later, Forster and Walton called Gates' treasurer Michael Butz to discuss crediting the inventory Colonial held for Gates against Gates' overdue account. Colonial's version of this December 19, 1988 telephone conference is that Butz volunteered to return the inventory as partial payment of the credit; however, Gates' version emphasizes that Butz only agreed to review the proposal concerning crediting the inventory and would finalize the return after January 1, 1989. Still, Forster and Walton spoke with Gates' president Anthony Clapperton on December 20, 1988 about Colonial's price increases as well as the proposed crediting of Gates' account. Credit memos were apparently sent later but pre-dated December 20, 1988. Gates filed its Chapter 11 petition on January 25, 1989. In February, Colonial issued a "Customer Owned Inventory Confirmation" which reflected January inventory balances. These sheets were sent on a monthly basis to Gates to indicate the balance of inventory held by Colonial. Subsequently, Gates filed the instant adversary proceeding against Colonial.

### Discussion

The sales involving the disputed inventory were part of numerous dealings that Gates and Colonial engaged in since 1985. Although there was a verbal agreement as to when delivery was to be made, the parties never entered into any overriding written agreement which governed the sales. Nor did any formal security agreement exist which would have created a consensual lien against Gates' inventory in favor of Colonial for satisfaction of Gates' credit account. As a result, the disputed sales are controlled primarily by the respective writings connected with each transaction, i.e., the initial Gates purchase orders, the Colonial invoices, and any other writings relating to these sales. Moreover, various "gap-fillers" under the U.C.C. are also incorporated along with trade custom and the parties' course of dealing. Article 2 of the

U.C.C. applies because the subject matter concerns "goods". U.C.C. § 2–105. Before addressing the interplay of the relevant U.C.C. provisions as well as the Bankruptcy Code, the choice of law question must be resolved.

### Choice of Law

The three transactions concern three different and distinct contracts which had some relation with at least four states: Delaware, Tennessee, North Carolina, and South Carolina. Under the center of gravity approach, Tennessee law would be the most applicable since that state was the "hub" of these transactions. *See Neville Chemical Corp. v. Union Carbide Corp.*, 422 F.2d 1205, 1211 (3d Cir.1970). This rule is applicable in determining setoff where the credit account and inventory are the subject matter at issue. Nevertheless, the respective contracts govern the actual mechanics of the transactions and where, as here, the agreements expressly state which state law governs, the parties' choice of law should be followed in interpreting the contracts. *See, e.g., In re Burger*, 125 B.R. 894, 900 (Bankr.D.Del.1991) (choice of law provision governed lease agreement). In this case, the boilerplate on the reverse of Gates' three purchase orders states under condition # 9 that "[t]he interpretation and performance of the contract resulting from Seller's acceptance hereof shall be governed by the law of the State of Delaware." Consequently, Delaware law governs these contracts. However, the court notes that there is no material difference among the relevant statutory provisions applicable in Delaware and the other states since all are modeled on the Uniform Commercial Code.

### U.C.C. Analysis and Contractual Provision Governing Transfer of Title to the Inventory

Essentially, the sales were part of a series of independent, bilateral contracts determined by their respective writings. There is no dispute that Gates fully paid for these sales; as revealed by Colonial's ledgers and invoices, the approximate

$146,178 owed by Gates 90 days before the bankruptcy filing was incurred from shipments to third parties in the later Summer and Fall of 1988 (where Gates' earned profits on the price mark-up). As indicated earlier, there was no formal written agreement between Gates and Colonial though there was a general "agreement to agree" which included the terms of when payment was due. Therefore, the documents forming the actual agreements involving the disputed inventory must speak for themselves along with the parties' prior course of conduct and trade usage. But first, the relevant U.C.C. sections must be reviewed to determine whether Colonial had a security interest in the goods; second, this determination must be considered in conjunction with the applicable Bankruptcy Code provisions to resolve whether the estate recovers or the debts offset.

Title 6, section 2–401 of the Delaware Code underscores the importance of title in sales transactions and makes title subordinate to other U.C.C. provisions when other sections are applicable. Section 2–401 states that:

Each provision of this Article with regard to rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this subtitle. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment, but

(b) if the contract requires delivery at destination, title passes on tender here.

(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods,

(a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or

(b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

(4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale".

6 *Del.C.* § 2–401. This provision's deemphasis of title naturally follows from Article 2's dealing of issues between buyer and seller on a step-by-step performance or non-performance basis under the contract of sale rather than pre-U.C.C. notions of when title passes. *See id.* Delaware Study Comment; U.C.C. § 2–401 Comment 1. Initially, the section refers the court to any other specific provision which deals with an issue needing resolution; only when no oth-

er U.C.C. section is applicable does title become relevant as delineated in § 2–401. *See* also 6 *Del.C.* § 2–106 ("A 'sale' consists in the passing of title from the seller to the buyer for a price (Section 2–401).")

■ Colonial asserts that it has a statutory lien in the inventoried goods under sections 2–703 and 9–113 of the U.C.C. and, therefore, title is irrelevant. Nonetheless, Colonial's argument is premised on the fact that these contracts involving the subject goods are somehow related with those lots of goods responsible for Gates' breach, i.e., the unpaid shipments commencing in the Summer of 1988. Although U.C.C. remedies should be liberally construed, it would be overreaching to impose a statutory lien upon one lot of goods for the breaches connected with other lots. *See* U.C.C. § 2–703 Comment 2. Colonial's reliance on *In re Ault*, 6 B.R. 58 (Bankr.E.D.Tenn.1980) is misplaced because that sale involved a conditional delivery which allowed the seller to invoke the Article 2 seller remedies, including a seller's lien under U.C.C. sections 2–703 or 9–113. Since the buyer's breaches here concern a collateral but separate and distinct contract, the remedies under § 2–703 have no application here. Absent a security or other unifying agreement, Colonial's contention cannot be supported by these facts since Gates' account was unsecured debt. Still, as will be seen below, the contractual provisions regarding the transfer of title will have the ultimate effect of granting Colonial a security interest in the goods under U.C.C. §§ 2–401 and 9–113.

■ Returning to § 2–401, the mere fact that the seller retains possession of the goods does not prevent concluding that title has passed to the buyer. *See* 6 *Del.C.* § 2–401(3). There may be a completed delivery although the goods remain in the possession of the seller if the seller's possession is as an agent or at the request of the buyer under an agreement to store and care for the goods; in such a situation, there is a constructive delivery because there is nothing further to be done by either party to complete the sale. *See, e.g., Lakeview Gardens, Inc. v. State*, 221 Kan. 211, 557 P.2d 1286 (1976). Therefore, in the absence of any provision to the contrary, the normal commercial understanding views title as passing upon the issuance of the invoice despite the seller's retention of possession. 6 *Del.C.* § 2–401(3)(b); *See also Beatty v. Parsons*, Del.Super., 80 A. 1063 (1911). This principle would follow for the present case, except that the boilerplate on the reverse of Gates' purchase orders stated under condition # 3 that:

> Unless otherwise agreed, title shall pass hereunder on unloading at destination, subject, however, to Buyer's right of inspection, approval and acceptance within reasonable time after arrival. Rejects may be returned at Seller's expense provided Seller is given reasonable time to advise disposition. Buyer may inspect material or equipment in Seller's plant during production, when made to special and particular specifications, without waiving right to subsequent rejection for undiscovered or latent defects.

Since Colonial's invoice reflects no changes to this provision, it becomes part of the contract and thereby determines when title passes ("title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.") *See* 6 *Del.C.* §§ 2–207(2), 2–401(1). *Accord Silver v. Sloop Silver Cloud*, 259 F.Supp. 187 (S.D.N.Y.1966).

Gates had paid for the goods in question to be held in consignment at Colonial's storage facilities; consequently, these "inventory moves" involved placing the inventory in a segregated area within the Colonial warehouses. Nevertheless, Colonial retained title to the goods in that it maintained exclusive control and possession. Most importantly, the sales contracts resulting from Gates' purchase orders and Colonial's invoices *explicitly* reserved title to Colonial until "unloading at destination" per the title reservation provision in Gates' purchase offer. The parties' prior course of conduct and trade usage strongly suggest that "destination" means Colonial's delivery of the goods to Gates or to a common carrier. 6 *Del.C.* § 2–401(2). *See also* 6 *Del.C.* § 2–503(4). The language of the boilerplate provision expressly with-

holds title from passing to Gates until it is delivered to its destination. The extrinsic evidence relevant to this provision indicates that the EPDM was usually sold on consignment where Gates would profit on the price mark-up. Naturally, Gates received a number of benefits under this provision such as the right to inspection and rejection of the goods, and it must also bear the detriment of its own boilerplate language. The contracts expressly suspended the vesting of title in the EPDM inventory until it was finally committed to Gates or a third party. Furthermore, under § 2–401(1), "[a]ny retention or reservation by the seller of the title ... is limited in effect to a reservation of a security interest." In conjunction with 6 *Del.C.* § 9–113, section 2–401(1) grants Colonial a security interest in the stored inventory which could be utilized to secure Gates' account with Colonial. Obviously, but for this provision, Gates would have had title under 6 *Del.C.* § 2–401(3)(b) and no security interest would have been created. *Cf. In re Phoenix Steel Corp.*, 76 B.R. 373 (Bankr.D.Del. 1987). As to the money paid for those goods, Gates acquired an equitable interest against the goods and, therefore, Colonial owed Gates for the sums paid thereby creating a mutual obligation.

Gates has alleged Colonial converted the goods. Under this business arrangement, these transactions operated as delayed sales rather than bailments. The parties contemplated the eventual transfer of ownership and possession of the EPDM inventory instead of giving ownership to the buyer outright by either the express terms of agreement or operation of law. The business purpose for this apparently was for Gates to avoid Colonial's price increases and for it to sell the materials for profit on consignment. This case is factually distinguishable from *In re Windsor Communications Group, Inc.*, 79 B.R. 210 (E.D.Pa.1987) and similar bailment cases relied upon by Gates. In *Windsor*, the debtor delivered paperstock to a printing company for manufacture into greeting cards whereby the debtor agreed to pay the printing company for its services. When the debtor fell behind in payments, the creditor printing company sold the paperstock and applied the proceeds to the debtor's accounts. Subsequently, an involuntary petition was filed against the debtor and the trustee brought suit against the creditor seeking turnover of the paperstock. The *Windsor* court held that the creditor was not entitled to setoff under § 553 since there was no mutual obligation of debt.

Here, there was no bailment and, thus, no conversion because Colonial had title to the goods under each of the contracts involving the inventory. Moreover, the parties' representatives verbally agreed to offset the respective accounts on or about December 19 and 20 of 1988. This agreement was memorialized by the credit memorandums which were subsequently sent (on two occasions) to Gates. Finally, the "Customer–Owned Inventory Confirmation" sheets sent to Gates by Colonial cannot be deemed documents of title or warehouse receipts sufficient to overcome the contractual language governing the inventory at issue. Gates has not asserted that these inventory itemizations fall under Article 7 of the U.C.C. and the court cannot view them as such based on the present record. These record transactions alone cannot determine title but represent only bookkeeping procedures which do not negate the express terms of the agreements. *See Crocker Nat'l Bank v. IDECO Div. of Dresser Indus.*, 839 F.2d 1104 (5th Cir.1988). Since there was no bailment relationship with respect to the goods, Gates cannot succeed in claiming Colonial converted the EPDM inventory.

### *Setoff of the Mutual Debts*

Section 553 of the Bankruptcy Code preserves in bankruptcy the equitable right of setoff available at common law. *United States v. Norton*, 717 F.2d 767, 772 (3d Cir.1983). The principle of setoff permits parties that owe mutual debts to each other to state the accounts between them, subtract one from the other and pay only the balance. *In re Bevill, Bresler & Schulman Asset Mgmt.*, 896 F.2d 54, 57 (3d Cir.1990). This rule is grounded on the

absurdity of "making A pay B when B owes A." *Studley v. Boylston Nat'l Bank,* 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913). Setoff prior to bankruptcy, if made within the parameters of the Code, does not constitute a preference. *In re Carnell Construction Corp.,* 424 F.2d 296 (3d Cir.), *cert. denied sub nom., Masterson v. Valley Nat'l Bank of Long Island,* 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970).

 Upon these facts, Colonial exercised a valid pre-petition setoff against the mutual debt existing between itself and Gates in December 1988 under non-bankruptcy law. In this setoff scenario, Tennessee state law applies because the nature, existence, and enforceability of claims sought to be setoff are determined by applying the law of the state where the operative facts occurred. *See Porreca v. Freeman (In re Oscar Nebel Co., Inc.),* 117 F.2d 326 (3d Cir.1941). *See also In re Williams,* 61 B.R. 567 (Bankr.N.D.Tex. 1986). Gates owed Colonial around $148,-587.90 on the credit account in December 1988 and, in turn, Colonial owed Gates $64,-325 for the value of the unsold inventory where Gates' title was held in abeyance by virtue of the contracts until final delivery. *Cf. In re Morristown Lincoln–Mercury, Inc.,* 42 B.R. 413 (Bankr.E.D.Tenn.1984); *Hayes Pipe Supply v. McKendree Manor,* Tenn.Supr., 695 S.W.2d 174 (1985). The difference between these two amounts is $84,262.90 which appears on Colonial's Proof of Claim. Still, a bankruptcy trustee or debtor-in-possession may avoid as a preference a setoff of an unsecured debt to the extent that the creditor improves its position within 90 days of the bankruptcy filing. *See* 11 U.S.C. § 553(b)(1). *Accord In re Ebbler Furniture and Appliances, Inc.,* 804 F.2d 87 (7th Cir.1986). In this instance, Colonial improved its position at least $2,410 because the Gates' credit account debt was only $146,177.90 90 days before the petition was filed rather than $148,-587.90 owed in December of 1988. Therefore, Gates is entitled to the recovery of the $2,410 surplus and Colonial will be allowed to maintain its Proof of Claim in the amount of $84,262.90.

An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, June 27, 1991, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT judgment is entered in favor of the Plaintiff, GEC Industries, Inc., f/k/a Gates Engineering Co., Inc., and against the Defendant, Colonial Rubber Works, Inc., in the amount of $2,410.