In the Matter of Kirby E. JOY and Ruth
N. Joy, d/b/a Joys Genetics, Debtors.

AMERICAN NATIONAL
BANK, Plaintiff,

v.

Kirby E. JOY and Ruth N.
Joy, et al., Defendants.

Bankruptcy No. BK92–41752.
Adv. No. A93–4010.

United States Bankruptcy Court,
D. Nebraska.

July 8, 1994.

Richard P. Garden, Jr., Lincoln, NE, for American Nat. Bank.

John Vodra and Victor Lich, Omaha, NE, for Clayton Burke Walter, d/b/a Martin Bros. & Co.

John Hahn, Lincoln, NE, for Mary Ann Teten, James Teten, Walter Teten and Greg Teten, d/b/a Alvin Teten & Sons.

John M. Guthery, Lincoln, NE, for Kirby E. Joy and Ruth N. Joy, d/b/a Joys Genetics.

Victor E. Covalt, III, Lincoln, NE, for Chapter 11 Trustee.

## MEMORANDUM

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

This case involves competing claims between American National Bank, secured creditor of the debtors, and an alleged purchaser of hogs from the debtors as to the proceeds from the sale of approximately 1,704 head of hogs by the trustee in March of 1993 (See Ex. 139g). At trial it was established that the debtors had "sold" a number of the same hogs to more than one party, with each "purchaser" believing they were the sole owner of the hogs purchased. When this bankruptcy case was filed there were numerous conflicting claims of ownership in the hogs located on Dr. Joy's farms. However, all of the claimants except Clayton Burke Walter, d/b/a Martin Brothers Co., have assigned and/or settled their claims with Amer-

ican National Bank. I conclude, in partial reliance upon UCC § 2–326(3), that the Bank's security interest prevails over the interest of Mr. Walter.

### FACTS

Dr. Kirby Joy and his wife, Ruth Joy, d/b/a Joys Genetics, raised, bred, fed, and sold hogs as part of a farming business located in and around Nebraska City, Nebraska. Dr. Joy managed the operation on a day to day basis. Ruth Joy was only involved in the bookkeeping activities of the business and in the performance of ministerial tasks in the hog operation. The hogs were sold to third parties by private sale or at "production sales," which were large, advertised hog sales that took place at the farm of the debtors known as the Harm's Place (hereinafter the "Sale Barn"). At the production sales, hogs were sold under the name of Joys Genetics. Dr. Joy also had a separate veterinary practice, which is not the subject matter of this adversary proceeding.

As part of his hog operation, Dr. Joy entered various contracts with "cooperators," in which these cooperators "purchased" hogs from Dr. Joy. These contracts generally involved a "purchase" of "open gilts" by the cooperator with Dr. Joy agreeing to breed and care for these hogs during the gestation period. The hogs would then be sold by Dr. Joy and Dr. Joy would remit a previously guaranteed resale price plus a portion of the profit to the cooperator. The hogs were to be sold by Dr. Joy before "farrowing" or giving birth.

At the time these agreements were entered into, the cooperator would pay to Dr. Joy an amount equal to four (4) times the current market price of the hogs. During or upon completion of the contract, the cooperator would also pay the cost of feed for the animals. At the time the sales took place, the hogs involved were either already on Dr. Joy's premises or were to be acquired by Dr. Joy. The cooperators generally did not take delivery of the hogs "purchased," and allowed Dr. Joy to retain possession of the hogs. However, Bruce Wiles and Rusty Orme, cooperators no longer involved in the present action, often did take possession of

"purchased" hogs which they would then breed and return to Dr. Joy for a predetermined price. Dr. Joy did not eartag or separate the "purchased" hogs from other hogs on his premises. In addition, Dr. Joy kept hogs on several different farming locations, and the hogs "purchased" by the cooperators were very frequently moved back and forth between these various locations without notice to the "purchasers." This frequent movement of hogs, together with the lack of eartagging or other identification, made it difficult, if not impossible, for the "purchasers" to keep close track of hogs purchased under a given contract.

Occasionally Dr. Joy also entered into feeder pig contracts in which he agreed to care for and feed the hogs involved until they reached the appropriate weight for slaughter, at which time Dr. Joy would sell the hogs and remit the guaranteed price to the cooperator. Dr. Joy, as the "feeder," would retain any profit above the guaranteed price on these contracts. At trial Dr. Joy testified that these contracts were simply "hedge" contracts or paper transactions evidencing a loan to finance his operation.

The debtors were removed as debtors-in-possession and a trustee was appointed in the underlying bankruptcy case, BK92–41752, as a result of fraud by the debtors. Upon appointment, the trustee took control over property of the bankruptcy estate, including the hogs on hand at the time he was appointed. On March 11, 1993, the trustee sold approximately 1,704 head of hogs and received $104,000.00 in return. The trustee currently holds $82,975.24 in remaining proceeds from the sale. As stated before, preceding and during trial numerous creditors and cooperators which originally claimed an interest in the proceeds of the hogs sold by the trustee settled and/or assigned their claims with American National Bank. The only remaining defendant claiming an interest in the proceeds is Clayton Burke Walter d/b/a Martin Brothers & Co.

From July of 1990 to November 16, 1992, when this bankruptcy case was filed, Mr. Walter and Dr. Joy entered into 30 contracts concerning open gilts, and six contracts concerning feeder pigs. Mr. Walter's claim

against the $82,975.24 of hog proceeds held by the trustee is predicated on only two of the gilt contracts, Master Agreement # 26 (Ex. 116) and Master Agreement # 28 (Ex. 118), and one of the feeder pig contracts, 430 Feeding Agreement # 768 (Ex. 127).

Master Agreement # 26 (Ex. 116) was entered into on March 22, 1992, for 600 head of open gilts, part of which were to be hyl breed and part of which were to be spots. The purchase price of Master Agreement # 26, paid by Mr. Walter at the time the contract was entered into, was $105,600.00. Dr. Joy was given permission to market and sell these hogs through his facilities, and the guaranteed minimum price to be paid Mr. Walter upon settlement was $154,440.00. Although this contract indicates eartags were to be used to identify the hogs in question, testimony at trial established that, in fact, this did not occur.

Master Agreement # 28 (Ex. 118) was entered into on June 22, 1992, for 450 head of open gilts. The purchase price, paid by Mr. Walter at the time the contract was entered into, was $90,000.00. Dr. Joy was given permission to market and sell these hogs through his facilities, and the guaranteed minimum price to be paid to Mr. Walter upon settlement was $125,500.00. The provision for eartagging in this contract was not completed.

A contract captioned "430 Feeding Agreement # 768" (Ex. 127) was entered into on June 23, 1992, for 650 head of feeder pigs at a price of $37,500.00. There was no eartagging provision in this contract. Under the agreement, Dr. Joy was given exclusive marketing rights with respect to the hogs involved. Dr. Joy testified at trial that this was a "hedge" agreement, or mere paper transaction, while Mr. Walter maintains that there were actual pigs involved and this transaction constituted a sale of existing hogs.

Dr. Joy and Mr. Walter often had several contracts open at the same time. Also new contracts were entered into at about the same time as previous contracts were settled. The proceeds from hogs sold by Dr. Joy to Mr. Walter were used by Dr. Joy to pay Mr. Walter the outstanding balance on previous contracts between the parties. In other words, the proceeds obtained from the sale under a contract would generally be used by Dr. Joy to pay the guaranteed price and any profit due under the previous contract between the parties.

It was agreed between the parties that the purchase price of open gilts on the gilt contracts would be set at four times the market price at the time a given contract was entered into, and that by guaranteeing a minimum price in return that was not governed by the market, Dr. Joy would bear the risk of market fluctuations. The contracts between Dr. Joy and Mr. Walter were to be filled by hogs raised by Dr. Joy, or, in the case of hyls (or whites), hogs purchased by Dr. Joy. The arrangement between the parties ran smoothly at first, but towards the end of their relationship, Dr. Joy ran into financial trouble and was unable to properly settle some of the contracts between the parties, including the three at issue in this case.

The hogs under the agreements between Dr. Joy and Mr. Walter were not physically identified to a contract or separated from other hogs on his farms. Also, Dr. Joy often moved the hogs involved on a given contract from their initial location to different farms used by Dr. Joy without prior notification to Mr. Walter. In an attempt to monitor the hogs under his agreements with Dr. Joy, Mr. Walter conducted periodic "inventories" in which he would visit the different farms where Dr. Joy kept hogs, and count hogs to verify there were sufficient numbers of hogs to fill his contracts. In counting hogs, Mr. Walter relied on the verbal representations of Dr. Joy and the visual characteristics of the hogs as anticipated by the contracts and the gestation time period. Frequently hogs were not located in the place initially agreed to by the parties under a contract, and Mr. Walter would then have to obtain information from Dr. Joy as to the current location of the hogs. In addition, shortages were found on several occasions and brought to Dr. Joy's attention. In response, Dr. Joy would state that the missing hogs under a given contract had already been sold.

Mr. Walter did not file a Uniform Commercial Code ("UCC") financing statement notifying others of his interest in the hogs on the premises of Dr. Joy. However, Mr. Walter did notify his bank, Norwest Bank of Nebraska, of the arrangement, and Norwest Bank extended financing to Mr. Walter for the purpose of entering transactions with Dr. Joy. Norwest Bank prepared a form letter (See for example page 5 of Ex. 124) stating that it claimed a purchase money interest in the hogs "purchased" by Mr. Walter from Dr. Joy. Norwest Bank required Mr. Walter to deliver a copy of this letter to Dr. Joy at the time each contract was entered into. However, Norwest did not make a similar requirement in respect to American National Bank, and there is no evidence that American National Bank was provided a copy of this form letter or otherwise received notice of Norwest Bank's claimed security interest. Dr. Joy did not grant a security interest in the hogs on his premises to either Mr. Walter or to Norwest Bank.

At the time Dr. Joy and Mr. Walter began their relationship, Dr. Joy financed his operation through Farmers State Bank. However, in 1992, Dr. Joy began to finance his operation through American National Bank (the "Bank"), who extended credit to Dr. Joy on a short and long-term basis. As security for the lines of credit given to Dr. Joy, American National Bank obtained a duly perfected security interest in all of Dr. Joy's present and after-acquired inventory, farm products, and proceeds thereof. This finance arrangement was the result of a series of preliminary meetings between Dr. Joy and bank officers in which Dr. Joy explained his business to the Bank in general terms. American National Bank performed very little due diligence as to Dr. Joy's business, and did not contact Farmers State Bank until after extending credit to Dr. Joy. At no time did American National Bank tell Dr. Joy that he could not sell hogs from his inventory, and it was understood and agreed to by Dr. Joy and the Bank that payments on the lines of credit were to be made from the proceeds of the sale of livestock. The documents submitted by Dr. Joy to the Bank's loan committees indicated that the majority of Dr. Joy's income was derived from the sale of livestock on a regular basis.

## DISCUSSION

American National Bank asserts that it had a perfected security interest in all of the hogs on the debtors' premises on the date of bankruptcy and all offspring of said hogs. The Bank thus asserts that its security interest extends to all of the hogs sold by the trustee. The Bank argues that its security interest in the proceeds of the hogs sold by the trustee is senior in priority to the interest, if any, of Mr. Walter. Therefore the Bank argues that it is entitled to all of the hog proceeds. Mr. Walter asserts that at least part of the hogs sold by the trustee in March of 1993 were hogs he purchased pursuant to Master Agreement # 26, Master Agreement # 28, or 430 Feeding Agreement # 768, or their offspring. Mr. Walter argues that he is entitled to the proceeds attributable to this portion of the hogs sold. In support of his position that his interest in the hog proceeds is senior to the interest of the Bank Mr. Walter sets forth various arguments.

First Mr. Walter argues that American National Bank did not hold an enforceable security interest in the hogs in question, because Dr. Joy did not have a sufficient interest in the hogs for the Bank's security interest to attach. Second, Mr. Walter asserts that even if the Bank's security interest initially attached to the hogs in question, the Bank consented to the sale of hogs by Dr. Joy, and therefore Mr. Walter, as "purchaser," took free and clear of the security interest of the Bank. Third, in the alternative Mr. Walter argues that if the Bank did not consent to the sale or disposition of the hogs, Mr. Walter takes free and clear of the Bank's interest as a buyer of inventory in the ordinary course of business pursuant to § 9–307 of the UCC.

Fourth, Mr. Walter rejects the Bank's reliance on § 2–326 of the UCC, which governs consignments. Mr. Walter asserts that § 2–326 of the UCC does not apply to the facts of this case because the "sales" under the contracts in question were not sales on approval or return as required by this section of the

UCC. In addition, Mr. Walter asserts that subsection 3 of § 2–326 does not apply because Dr. Joy is not a "buyer" since he did not purchase or take title to the hogs involved and was only acting as an agent of Walter. Mr. Walter also argues that even if Dr. Joy qualifies as a "buyer" under § 2–326(3), this subsection does not apply because Dr. Joy was generally known by his creditors to be "substantially engaged in selling the goods of others." See Nebraska UCC § 2–326(3)(b) (Reissue 1992).

. Finally, Mr. Walter argues that he has adequately traced the hogs "purchased" by him to the hogs sold by the trustee, and therefore he is entitled to the proceeds therefrom. As evidence of tracing, Mr. Walter cites his testimony at trial as to his inspections where he observed hogs with physical characteristics consistent with those to be expected of hogs under his contracts with Dr. Joy, and his testimony comparing these characteristics to the hogs shown on the inventory taken by the trustee before sale (Ex. 139g).

### Attachment of the Security Interest of the Bank

■ The security interest of American National Bank extended to all of the hogs on Dr. Joy's premises on the date of bankruptcy and their offspring, including any hogs "purchased" by Mr. Walter that remained on the premises at bankruptcy and all hogs sold by the trustee. There is no dispute that a valid security agreement was executed and signed by the parties granting the Bank a security interest in the debtors' present and after-acquired inventory, farm products, and the proceeds thereof. It is also not disputed that the Bank filed a proper financing statement in the proper locations to perfect its interest under Article 9 of the UCC and under the Food Security Act. The only issue is whether the security interest of the Bank attached to the hogs claimed by Mr. Walter.

In order for a security interest to attach, 1) the collateral must be in the possession of the secured party or there must be a valid, signed security agreement describing the collateral; 2) value must have been given by the secured party; and 3) the debtor must have rights in the collateral. See Nebraska UCC

§ 9–203(1) (Reissue 1992). It has already been established that a security agreement adequately describing the collateral was signed by the parties, and that the Bank gave value to the debtors. I conclude that Dr. Joy had sufficient rights in the hogs existing on the date this case was commenced for the Bank's security interest to attach.

■ The Eighth Circuit has ruled that although a mere bailment or possession of goods is not a sufficient interest to permit attachment of a security interest, factors such as the degree of control exercised over the goods may be considered in determining if attachment has occurred. See *Rohweder v. Aberdeen Production Credit Association,* 765 F.2d 109, 112–113 (8th Cir.1984). It has also been held that a debtor has sufficient rights in collateral for a security interest to attach "where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession." *Morton Booth Co. v. Tiara Furniture, Inc.,* 564 P.2d 210, 214 (Okl.1977). Furthermore the location of title is not controlling. Nebraska UCC § 9–202 (Reissue 1992). Therefore, the fact that Mr. Walter purported to retain title to the hogs on Dr. Joy's premises is not determinative of Dr. and Mrs. Joy's rights in the collateral. In determining rights in collateral, a court should consider "the outward appearance of the debtor's rights of ownership and control in the collateral." *Brown v. United States,* 622 F.Supp. 1047, 1049–51 (D.S.D.1985).

In the present case, the hogs used to fill the contracts between Mr. Walter and Dr. Joy were either hogs that were already present on Dr. Joy's premises which he had raised, or hogs purchased by Dr. Joy in his own name. The contracts between the parties gave Dr. Joy the power to sell the hogs in question, and did not limit Dr. Joy's discretion as to the manner, place, or time of sale. Dr. Joy had complete control over the care of the hogs from the moment they were acquired up and to the time of sale. Dr. Joy freely moved the hogs from one farm to another on a regular basis. Furthermore, the hogs "sold" to Mr. Walter were not separated or distinguished in any way from other

hogs on Dr. Joy's premises, and public notice of Mr. Walter's interest in the hogs was not given to third parties purchasing at the sales conducted by Dr. Joy. The ability of Dr. Joy to control the collateral in question exceeded the rights of a bailee in a bailment situation—the hogs in question were not delivered to Dr. Joy for a set purpose, to be returned to Mr. Walter at a later date. In addition, the rights given to Dr. Joy under the arrangement between the parties certainly meet the "naked possession" standard set out in *Morton Booth Co.* Thus I conclude that the debtors had sufficient rights in the collateral for the security interest of the Bank to attach to the hogs allegedly "purchased" by Mr. Walter. The Bank held a perfected security interest in all of the hogs on the debtors' premises on the date of bankruptcy and their offspring, including hogs "purchased" by Mr. Walter that had not yet been sold and all of the hogs sold by the trustee.

**Sale of Collateral to Mr. Walter**

■ Mr. Walter asserts that he "purchased" hogs under the contracts in question and took free and clear of any interest of the Bank, either as a result of the Bank's consent to the sales or by virtue of being a buyer in the ordinary course. It is unnecessary to decide if an actual sale occurred in which Mr. Walter "purchased" identified hogs from Dr. Joy and obtained title to the hogs in question, because even if it is assumed that Mr. Walter "purchased" the hogs in question, his interest therein is inferior to that of American National Bank.

In order for an actual sale to occur, it must be shown that Dr. Joy owned the hogs "sold" under Master Agreement #26, Master Agreement #28, and 430 Feeding Agreement #768, and that these hogs were sufficiently identified to the contracts. The evidence on these difficult factual questions is highly conflicting in this case. Specifically, there exists a serious question of fact as to whether the hogs under the contracts involved were sufficiently identified to pass title to Mr. Walter. Section 2–501 of the UCC provides that identification occurs:

 (a) when the contract is made if it is for the sale of goods already existing and identified;

 (b) if the contract is for the sale of future goods ... when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers....

Nebraska UCC § 2–501(1)(a) and (b) (Reissue 1992).

With respect to the three contracts in question, some but not all of the hogs were identified to the contracts. For example, the spot hogs used to fill portions of the contracts were already existing and on Dr. Joy's premises at the time the contracts were made. However, Dr. Joy did not raise hyls, and therefore had to purchase hyls to fill contracts where necessary. In addition, the testimony as to whether hogs were specifically viewed and referenced by Dr. Joy as belonging to a particular contract is unclear. It is established that Dr. Joy did not segregate the hogs by contract. Therefore, I conclude that some, but not all, of the hogs involved under the three contracts in question were identified as required by § 2–501.

As to the hogs involved under the contracts which were not identified to the contracts, no sale of hogs occurred, and Mr. Walter is not entitled to assert a claim against third parties as to the hogs or the proceeds thereof. *Marietta Corp. v. New Jersey National Bank*, 612 F.2d 745 (3rd Cir.1979) (holding that a buyer can not assert rights against third parties where goods remain in the seller's possession unless the goods are identified to the contract). On the other hand, as to those hogs identified to the contracts, a sale of identified hogs did occur and Mr. Walter may assert rights as a "purchaser" under the UCC.

**Consent by the Bank to the Sales of Dr. Joy**

■ Having concluded that the security interest of the Bank attached to the hogs in question, and that some of these hogs were then sold to Mr. Walter, it must next be determined if Mr. Walter, as "purchaser", took free and clear of the Bank's security interest. If the Bank consented to the sales by Dr. Joy, the security interest of the Bank would not continue in the collateral after the sale, and Mr. Walter would take free and

clear of this interest. See Nebraska UCC § 9–306(2) (Reissue 1992). I conclude that the Bank consented to the sales of livestock by Dr. Joy, and that as to the hogs identified to the contracts, Mr. Walter, initially at least, took free and clear of the security interest of the Bank.

At trial it was admitted that American National Bank explicitly consented to the sales of Dr. Joy in the ordinary course of business. However, the Bank maintains that this consent did not apply to sales such as those to Mr. Walter. I conclude that the Bank consented to sales by Dr. Joy, including those to Mr. Walter, for several reasons. First, the loan agreements between Dr. Joy and American National Bank contemplated that payments on the lines of credit would be made from proceeds obtained from the sale of livestock. Second, the Bank was aware that the major source of Dr. Joy's income came from the sale of livestock. Third, the Bank did not diligently investigate the business practices of Dr. Joy before or after extending him credit. Fourth, the Bank did not prohibit Dr. Joy from selling livestock. Fifth, representatives from the Bank never actually discussed with Dr. Joy any limitations upon his ability to sell livestock.

Therefore, I conclude that the Bank consented to the sales by Dr. Joy, and such consent extended to the transactions with Mr. Walter. As a result, the security interest of the Bank did not continue in the collateral after the sales occurred, and Mr. Walter initially took free and clear of the Bank's interest pursuant to § 9–306(2) of the UCC.

Since Mr. Walter took free and clear of the security interest of the Bank as a result of the Bank's consent, it is unnecessary to consider § 9–307 of the UCC and whether Mr. Walter was a buyer in the ordinary course.

**Applicability of Section 2–326(3) of the UCC**

■ Section 2–326(3) of the UCC provides: Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery

 (a) complies with an applicable law providing for a consignor's interest . . . to be evidenced by a sign, or

 (b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

 (c) complies with the filing provisions of the Article on Secured Transactions (Article 9).

Nebraska UCC § 2–326(3) (Reissue 1992).

Section 2–326 addresses the problems which arise when a seller of goods is placed in a position of ostensible ownership. See *Georgia–Pacific Corp. v. Walter E. Heller & Co. Southeast, Inc.*, 440 So.2d 666 (Fla.App. 1983). For example, a consignment exists where the owner of a ring places the ring with a diamond broker for purposes of sale. *Bischoff v. Thomasson*, 400 So.2d 359 (Ala. 1981). The creditors of the broker obtain an interest in the diamond ring since they may be misled as to the actual ownership of the ring. The party giving possession of the goods to the seller may protect themself from this result by one of the three methods set out in § 2–326(3)—posting a sign under an applicable sign law, establishing that the seller is generally known to be substantially in the business of selling the goods of others, or performing a UCC filing in accordance with Article 9.

I conclude that § 2–326(3) applies to the facts of this case. As to the hogs sold to Mr. Walter, Mr. Walter initially obtained ownership rights in these hogs free and clear of the security interest of the Bank. However, Mr. Walter permitted these hogs to remain in Dr. Joy's possession and did not publicly disclose his interest in the hogs, thus creating the appearance of ostensible ownership by Dr.

Joy. As a result, the creditors of Dr. Joy could have been misled into believing that Dr. Joy owned the hogs in question. Under UCC § 2–326(3), the hogs "purchased" by Mr. Walter became subject to the security interest of the Bank as a result of Mr. Walter's leaving the hogs in Dr. Joy's possession.

■ Mr. Walter argues that § 2–326(3) is inapplicable to this case because the "sale" to Mr. Walter was not a "sale on approval or return," and Dr. Joy is not a "buyer." This argument is misguided. Subsection 3 of § 2–326 provides that a situation is *deemed* to be a sale on approval or return if the requirements of the subsection are met. Thus, if the requirements are met, the situation is treated as a sale on approval or return from the standpoint of the creditors of the party with possession of the goods, regardless of whether it actually is a sale on approval or return. Although the person with possession of the collateral may not be an actual "buyer," he is treated as a "buyer" for purposes of § 2–326(3) if the requirements of that subsection are met, namely if the goods are delivered for sale to a person in the business of selling goods of that kind. See *In re A & T Kwik–N–Handi, Inc.*, 13 UCC Rep.Serv. 779, 1973 WL 21385 (Bankr.M.D.Ga.1973) (stating that it is not necessary under § 2–326(3) for the person receiving the goods to be the buyer). Furthermore, in determining if the requirements of § 2–326(3) for a consignment are met it is not the intent of the parties that governs, but the objective appearance of the arrangement between the parties. *Bischoff v. Thomasson*, 400 So.2d 359 (Ala.1981).

■ All of the requirements of UCC § 2–326(3) are met in the present case. First, although there was no change in physical possession of the hogs purchased by Mr. Walter, I conclude that on the facts of this case the delivery requirement of § 2–326(3) is satisfied. By virtue of the contracts between the parties, there was a constructive delivery both from Dr. Joy to Mr. Walter in regard to the original sale, and from Mr. Walter back to Dr. Joy for purposes of authorizing Dr. Joy to control and sell the animals. "Constructive delivery" occurs where the conduct of the parties involved is inconsistent with any conclusion other than that there has been a change in the nature of the possession. *Integrity Ins. Co. v. Marine Midland Bank–Western*, 90 Misc.2d 868, 396 N.Y.S.2d 319 (1977).

In the present case, the conduct of the parties in signing the contracts in question, and voluntarily agreeing that Mr. Walter was "purchasing" hogs but Dr. Joy would retain possession of these hogs clearly indicated a change in the nature of the possession by Dr. Joy. The express provision allowing Dr. Joy to retain possession of the hogs was in lieu of a delivery to Mr. Walter for purposes of sale, and then a subsequent delivery back to Dr. Joy for purposes of caring for and selling the animals. Thus, the contracts between the parties indicated the parties' intent that constructive delivery for purposes of sale and retention occur upon the signing of the contracts. For purposes of sale, a "delivery" may occur even though goods remain in the seller's possession where the seller is acting as an agent or maintains possession at the request of the buyer pursuant to an agreement to store and care for the goods. Cf. *In re GEC Industries, Inc.*, 128 B.R. 892, 898 (Bankr.D.Del.1991) (stating that retention of possession of goods by a seller does not prevent delivery for purposes of sale). Similarly for purposes of consignment, a "delivery" under § 2–326(3) occurred under the facts of this case.

Second, the hogs in question were delivered to Dr. Joy for the purpose of sale. Even though part of the responsibilities of Dr. Joy under the contracts was to breed and care for the livestock, the right to sell the livestock was clearly contemplated by the parties, and it was for the purpose of obtaining money upon sale that the contracts were entered into. Testimony at trial established that Dr. Joy was allowed to retain and care for the hogs because the parties contemplated that Dr. Joy's expertise and reputation in these matters would help bring a better price for the hogs upon sale. Section 2–326(3) has been applied to situations like the present case where goods are held for ultimate sale. See *In re Miller*, 119 B.R. 660 (W.D.Ark. 1990) (holding that seed being held for "ultimate sale" fell within confines of § 2–326(3)

regardless of interim responsibilities and measures); *In re Novak,* 7 UCC Rep.Serv. 196, 1969 WL 11107 (Md.Cir.Ct.1969). I conclude that such a result is consistent with the policy behind § 2–326(3) to resolve "all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." See Comment 2 to Nebraska UCC § 2–326(3) (Reissue 1992). See also *First National Bank of Blooming Prairie v. Olsen,* 403 N.W.2d. 661, 664 (Minn.App.1987) (citing *In re Novak,* 7 UCC Rep.Serv. 196 at 201–02) (stating that this interpretation is consistent with the intent of the framers of the UCC).

Third, Dr. Joy maintained a place of business at which he sold goods of the kind involved in this case, namely hogs. The sale of hogs was a major portion of Dr. Joy's business, and he conducted both private and public sales on a regular basis. At the regularly conducted sales on his premises, Dr. Joy sold hogs under the name of Joys Genetics rather than the name of any of his cooperators.

Therefore, the requirements of § 2–326(3) are met, and the hogs left in Dr. Joy's possession by Mr. Walter are deemed to be held for sale on approval or return. As a result, the hogs in Dr. Joy's possession on the date of bankruptcy were subject to the claims of American National Bank. Even though Mr. Walter originally took free and clear of the Bank's interest by virtue of the Bank's consent to sales by Dr. Joy, subsequent to the sale, the hogs left on Dr. Joy's premises became subject to the Bank's security interest by virtue of § 2–326(3).

 Mr. Walter also asserts that even if the requirements of § 2–326(3) are met, the hogs "purchased" by Mr. Walter are not subject to the claims of the Bank since Dr. Joy was "generally known by his creditors to be substantially engaged in selling the goods of others...." See Nebraska UCC § 2–326(3)(b) (Reissue 1992). I conclude that the facts of this case do not fit this exception to § 2–326(3). Dr. Joy was not generally known by his creditors to be in the business of selling the goods of others. Testimony at trial established that Dr. Joy continuously told American National Bank that he owned all the hogs sold by him. Dr. Joy sold hogs at his Sale Barn under the name of Joys Genetics, not the name of any cooperator. The parties purchasing hogs at these sales were not informed of any possible interest of the cooperators in the hogs. I conclude, as a finding of fact, that Dr. Joy was not generally known by his creditors to be substantially engaged in the business of selling the goods of others.

It has been held that although a person may not be generally known to be in the business of selling the goods of others, a creditor with *actual* knowledge may not recover under § 2–326(3). See *GBS Meat Industry Ptv. Ltd. v. Kress–Dobkin Co.,* 474 F.Supp. 1357, 1362–63 (W.D.Pa.1979) aff'd 622 F.2d 578 (3rd Cir.1980); *First National Bank of Blooming Prairie,* 403 N.W.2d at 665. I conclude that American National Bank did not have actual knowledge that Dr. Joy was selling the hogs of others. As stated before, Dr. Joy continuously told the Bank that the hogs he sold belonged to him and not others. Furthermore, although the Bank became aware of dealings between Dr. Joy and Rusty Orme, in which hogs were "sold" to Mr. Orme to be bred and then returned to Dr. Joy for a predetermined price, the Bank did not obtain actual knowledge that Dr. Joy was substantially engaged in the business of selling the goods of others. The Bank called a meeting with Dr. Joy, diligently questioned Dr. Joy as to the situation with Rusty Orme, and was assured by Dr. Joy that he owned all of the hogs sold through his hog operation. Therefore, I conclude that the Bank did not obtain actual knowledge that Dr. Joy was substantially engaged in the business of selling the goods of others.

Therefore, pursuant to § 2–326(3), American National Bank obtained a security interest in all hogs purchased by Mr. Walter and Mr. Walter's interest is subject to the interest of the Bank.

**Failure to Trace**

 As an alternative basis for my decision, I conclude that even if § 2–326(3) did not apply to this case, Mr. Walter could not recover from the proceeds obtained from the sale by the trustee because he has failed to

trace the hogs "purchased" by him under the three contracts in question. In other words, Mr. Walter has failed to show that hogs he "purchased" from Dr. Joy were among the hogs sold by the trustee. Mr. Walter never actually inventoried or viewed the hogs sold by the trustee in March of 1993. In attempting to trace the hogs "purchased," Mr. Walter relies on a comparison of the physical characteristics of the hogs present at the last inventory taken by him in October of 1992 (Ex. 140) to the categories and weights listed on the inventory taken by the trustee before sale. (Ex. 139g).

Mr. Walter's testimony is speculative and not persuasive for several reasons. First, because the hogs were never eartagged, were often relocated, and Dr. Joy had contracts out with various cooperators at the same time, it is impossible to determine what hogs belonged to what contract. At most Mr. Walter could determine in his inventories that there were present sufficient number of hogs with characteristics similar to what one would expect of hogs under a given contract time period. Second, the evidence establishes that Dr. Joy continuously sold livestock from his premises. Thus even if it could be established that the hogs present on a given day were the hogs "purchased" by Mr. Walter under a certain contract, this does not establish that these same hogs were present at the date of bankruptcy or the date of the sale by the trustee. Third, Mr. Walter relies on physical characteristics common to all hogs of similar age, sex, breed, and weight to identify his hogs. At trial the testimony of Mr. Teten established that it is impossible to distinguish between hogs of like breed, sex, age, and weight. Furthermore, Mr. Walter's extension of these characteristics to a prediction of future characteristics is not a sufficient basis for tracing.

I conclude that Mr. Walter's attempt at trial to prove that the hogs sold by the trustee were hogs that he purchased from Dr. Joy, or the offspring of such hogs, was not credible because his analysis and conclusions involved speculation and unjustified assumptions. Given the various contracts with other cooperators, it is just as likely that the hogs viewed by Mr. Walter in his inventories were hogs "purchased" by someone else, as it is that such hogs were the hogs "purchased" by Mr. Walter. There is no evidence from which I would conclude that Mr. Walter has established an ownership interest in any of the hogs sold by the trustee.

### CONCLUSION

Mr. Walter is not entitled to recover any portion of the proceeds from the sale of hogs conducted by the trustee. There are three alternative reasons for this conclusion. First, it is not clear that Mr. Walter actually purchased hogs from Dr. Joy since the facts are inconsistent as to identification. Second, assuming that Dr. Joy "purchased" hogs free and clear of the security interest of American National Bank under Master Agreement # 26, Master Agreement # 28, and 430 Feeding Agreement # 768, such hogs subsequently became subject to the security interest of the Bank by virtue of § 2–326(3) of the UCC when Dr. Joy was allowed to retain possession of the hogs. Third, even if § 2–236(3) was not applicable to the facts of this case, Mr. Walter can not recover because he has failed to trace the hogs "purchased" by him from Dr. Joy to the hogs sold by the trustee.